**Janette Allyn HAWKINSON, Ruth A. Winchester, Jo Susan Verspohl, Ella Lee Ford, Linda A. Parks, Mary Jayne Catto, Xenia D. Graves, Diane Whitney, Merrilyn Dickens, Stefanie M. Selden, Donna Cornelisse, and Bonnie Alexander-Frisk, Plaintiffs,**

v.

**A.H. ROBINS COMPANY, INC., a Virginia corporation, Defendant.**

Civ. A. Nos. 75–M–714, 80–M–10, 80–M–389, 80–M–442, 80–M–603, 80–M–605, 80–M–766, 80–M–1677, 81–M–209, 81–M–210, 81–M–639 and 81–M–659.

United States District Court, D. Colorado.

Sept. 18, 1984.

Douglas Bragg, John T. Baker, Bragg & Dubofsky, Denver, Colo., Joe Gordon McPhee, Telluride, Colo., for plaintiffs.

Harmon Graves, Charles Socha, Tilly & Graves, Denver, Colo., Deborah M. Russell, McGuire, Woods & Battle, Richmond, Va., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

MATSCH, District Judge.

These twelve civil actions were consolidated for trial to the court because all of the plaintiffs claim that they suffered injuries from the use of the same product, manufactured and marketed by the defendant, the Dalkon Shield intrauterine contraceptive device. These claims are brought within the jurisdiction provided by 28 U.S.C. § 1332, and the law of Colorado is applicable in all of these cases.

### EARLY PRODUCT HISTORY

The Dalkon Shield device was designed by the joint efforts of Dr. Hugh James Davis and Mr. Irwin S. Lerner. Dr. Davis is a physician who, at all relevant times, was an associate professor at Johns Hopkins University School of Medicine, serving as director of its family planning clinic since 1963. Dr. Davis practiced obstetrics and gynecology ("OB/GYN") in the clinic at Johns Hopkins and also served some private patients there, although he was never board certified in that specialty. He did experimental work with intrauterine devices at Johns Hopkins Hospital from about 1963 to 1967 under various grant programs. He began discussions with Mr. Lerner in 1967, and, on June 10, 1968, they entered into an agreement by which Dr. Davis would be compensated for his help in the development and testing by Lerner Laboratories of an experimental intrauterine device which became the Dalkon Shield, and would undertake a program of testing the device to determine its safety and reliability. Essentially, Dr. Davis was to receive 5% of sales.

The Dalkon Shield is an oval shaped plastic device, slightly larger than a dime, with fin-type projections on each side. It was designed to conform to the shape of the uterine cavity and the projections were added to improve resistance to expulsion and to cause the device to be fundal seeking with normal uterine movements. A tailstring was tied to the bottom of the Shield by a knotted loop as an indicator of proper placement of the device and as a means for removal of the Shield. When this IUD was placed properly in the uterus, the tailstring projected through the cervix and into the vagina. A locator knot was tied at a point where it could be seen by the physician and felt by the patient as an assurance that placement was proper. Because the removal of the Dalkon Shield required greater force than other IUDs, the string had to be stronger, and this was accomplished by the use of multiple strands of suture material encased by a nylon sheath open at both ends.

Dr. Davis began inserting Dalkon Shields into women at the Johns Hopkins clinic beginning in August, 1968, and he collected data concerning 640 women for a one-year period up to September, 1969. Dr. Davis authored two publications reporting the ex-

perience of those women. One appeared in **Excerpta Medica** and another was a two-page article appearing in the **American Journal of Obstetrics and Gynecology** in February, 1970. In those articles, Dr. Davis reported a pregnancy rate of 1.1%, and he was very enthusiastic about the Shield device.

Dr. Thad Earl, M.D., was a physician with a general practice in Defiance, Ohio, with approximately 70% of his practice in obstetrics and gynecology. He was not board certified in that medical specialty. He read a newspaper article about the Dalkon Shield and went to Baltimore to consult with Dr. Davis about it. As a result, Dr. Earl became very enthusiastic about using this device and purchased some 48 of them from Mr. Lerner at his business in Greenwich, Connecticut. Dr. Earl took the Shields to his office in Defiance and inserted them in his patients, including his wife. Dr. Earl was very careful with follow-up on his patients and took endometrial biopsies. The biopsy tissue was then examined by a pathologist. These studies were understood by Dr. Earl as confirming his view that the Dalkon Shield was effective because it evoked an inflammatory response in the endometrial tissue.

By the Spring of 1970, Mr. Lerner, Dr. Davis, and a lawyer, named Robert Cohn, formed the Dalkon Corporation as a Connecticut corporation for the purpose of manufacturing and marketing the Dalkon Shield. In April, 1970, Dr. Earl purchased a 7½% interest in the Dalkon Corporation for $50,000, and with that purchase, Dr. Earl became the company's medical director.

A.H. Robins Company, Inc. ("Robins") is a well-established pharmaceutical company which had no experience in the contraceptive products market before June, 1970. There was no OB/GYN on the defendant's staff in any department. Dr. Frederick Clark, Jr. is a physician who was Medical Director of A.H. Robins Company, appointed in 1964, although he did not always function in that capacity. He was made Assistant Vice-President in September, 1971, and Vice-President on September 1, 1973.

In May, 1970, Dr. Earl had contact with a representative from Robins, and discussion of a sale of the Dalkon Shield to Robins followed. Robins did very little to investigate this device before proceeding with the purchase negotiations. Dr. Clark read the Dr. Davis article in the February, 1970 issue of **American Journal of Obstetrics and Gynecology**. Dr. Clark, Roy Smith and Ed Davis from Robins went to see Dr. Thad Earl in Defiance, Ohio, and looked at six to ten case records provided by Dr. Earl. Dr. Clark then made a trip to see Dr. Hugh Davis on June 8, 1970, and wrote a memorandum in which he reported that Dr. Davis had data for the first 14 months, from September, 1968 through November, 1969, covering 832 insertions with 26 pregnancies. That apparent difference from the reported pregnancy rate of 1.1% did not generate any concern at Robins.

The sale to Robins took place on June 12, 1970 for a purchase price of $750,000 plus a 10% royalty. Additionally, Dr. Davis was given a consulting contract by Robins for three years at $20,000 per year, which contract was later extended for another two years, to 1975.

Dr. Earl suggested that Robins finance an endometrial biopsy study, but that was not done because of a reluctance to incur the costs and the lack of a definite methodology. Dr. Earl became a consultant for Robins by an agreement dated June 20, 1970, for three years at a retainer of $30,000 per year. In that role, Dr. Earl attended many meetings of medical groups as a spokesman for the Dalkon Shield. He exhibited a film and talked with doctors in a Robins booth set up at such meetings. Dr. Earl used the Dr. Davis paper from the **American Journal of Obstetrics and Gynecology** at these meetings, and distributed many reprints of that article.

Dr. Clark developed a project plan for the use of doctors as clinical investigators of the Shield and, after Robins' purchase, Dr. Chremos was Robins' employee charged with supervising these clinical investigations because he had experience with such work with other Robins prod-

ucts. Dr. Chremos made a visit to Dr. Hugh Davis on February 3, 1971, at his office at Johns Hopkins Hospital. After their talk, Dr. Chremos recommended that Dr. Davis not be used as a clinical investigator because of the possible bias resulting from his being a participant in the invention and development of the device. He did not make a recommendation that the company discontinue the use of Dr. Davis' article. Robins made plans for other testing of the Dalkon Shield in anticipation of the need for it if IUDs became subject to government regulation. That possibility was then being considered by the Food and Drug Administration and some members of Congress.

In January, 1971, Robins began dual campaigns, both testing and marketing a modified Shield. Although the parties dispute the matter, it is this court's view that the modifications made to the Dalkon Shield by Robins are not changes of significance to the issues in these cases. Robins made the Dalkon Shield in two sizes. The standard size was for use in multiparous patients and a smaller size was recommended for use in nulliparous women.

The Earl consultation agreement with Robins ended in June, 1972. Dr. Earl left Defiance, Ohio and moved to Lordsburg, New Mexico at the end of June, 1972, because of personal medical problems. After a few months there, he moved to Sierra Vista, Arizona. On June 23, 1972, shortly before leaving Defiance, and after his consultation agreement had expired, Dr. Earl wrote a letter which is in evidence as Plaintiffs' Exhibit 530. That letter was addressed to John Burke at Robins, and refers to the last two meetings Dr. Earl attended: the American Academy of Obstetricians and Gynecologists at Chicago, and the AMA meeting in San Francisco. Dr. Earl reported several discussions with physicians who reported problems with the use of the Dalkon Shield, including higher pregnancy rates in certain areas, difficulty with removal, difficulty with insertions and an increase of infections in nulligravida women. Dr. Earl outlined how he responded to those problems by emphasizing the importance of the proper technique for insertion, assuring high fundal placement. It was not until the third paragraph of page three of the letter that Dr. Earl wrote the following paragraph which has become very much emphasized by the plaintiffs in these cases:

> The next situation I have found is with women becoming pregnant and if the Shield is left in place the women abort at 3½ to 5 months and become septic. I am advising physicians that the device should be removed as soon as a diagnosis of pregnancy is made. Numerous physicians have noted this. In my six pregnancies, I removed one and she carried full term, the rest all aborted and became septic. I therefore feel it is hazardous to leave the device in and I advise that it be removed. I realize that this is a small statistic but I feel we should correlate this data with other investigators across the country, because most men are experiencing the same problem. Plaintiffs' Exhibit 530.

Dr. Earl closed the letter with the information that he was going to Lordsburg, New Mexico on June 26. No one from Robins contacted him to follow up on the contents of his letter.

## MANUFACTURING AND MARKETING HISTORY

The defendant began production of the Shield at its Chapstick Division in June, 1971. Before that, Lerner Laboratories had made the Shields for Robins' marketing. This product was produced at Chapstick because the assembly was a hand-assembly, and Chapstick had employees who were experienced hand-assemblers.

The initial project coordinator for Robins when it acquired the Dalkon Shield was Mr. R.W. Nickless. Mr. Nickless wrote an orientation report on the product, dated June 29, 1970, for distribution throughout many departments of the Robins Company. In that memorandum, Mr. Nickless described the background of the Dalkon Shield and the production methods utilized by the Dalkon Corporation under the supervision of Mr. Lerner. In that memorandum, Mr.

Nickless included the following summary statement:

> The string or "tail" situation needs a careful review since the present "tail" is reported (by Mr. Lerner) to have a "wicking" tendency.

Plaintiffs' Exhibit 91.

The tailstring on the device became the subject of interest at Robins in the summer of 1971 for two reasons. First, Chapstick reported production problems because of stiffness and a tendency of the string to break during the tying operation. Second, there were adverse reaction reports of penile trauma from contact with the string during intercourse. Wayne Crowder, a worker in the quality assurance department at Chapstick, tried boiling the string to make it softer, and suggested blunting the end of the string by beading it through exposure to flame. In a memorandum dated July 28, 1971, discussing the matter of stiffness, Mr. Crowder questioned the value of the sheath, indicating that he understood its purpose was to keep the interior of the string dry "and thus thwart bacterial growth." He pointed out that the string has two exposed cut ends and when exposed to water can become wet inside. He reported in the memorandum that this can be demonstrated by immersing one end of the string in a beaker of water and, after standing overnight, small droplets of water can be milked out of the other end. Mr. Crowder concluded his memorandum with the following paragraph:

> Unless the sheath has some function other than the one given by Mr. Lerner—to keep the inside of the string dry—it would seem that a braided nylon string might serve equally well as the sheathed string and avoid the problem associated with stiffness.

Plaintiffs' Exhibit 325.

Dr. Ellen Preston, a staff physician for Robins, is an M.D. with a Masters in Public Health, but without any training or experience in OB/GYN. She became the product monitor for the Shield in February or March of 1971. Her responsibilities included reviewing adverse reaction reports received at Robins.

On August 9, 1971, Dr. Ellen Preston wrote a memorandum to Dr. Fred Clark advising that Mr. Daniel French, executive vice-president of Chapstick, had called her about production problems with the string, noting that it had been shown that the open ends of the string will wick water, and suggesting that if that is so, the ends will wick body fluids containing bacteria.

Dr. Clark's response was a somewhat petulant letter of August 20, 1971, to Mr. Daniel French. The following two paragraphs of that letter are important to the issues in these cases:

> Because of the unique and novel (to AHR) features, and because of the multiplicity of people involved, this product has been "handled in the usual" (new chemical product) manner in few if any ways. For instance, your assumption that the "Medical Department", rather than the Quality Assurance Group would have cognizance over the production problems and specifications of the Shield (string) is an example of the confusion which exists. Your statement that you have written Mr. Morton requesting that he use his influence "to stir up a little activity in the Medical Department" falls on somewhat sensitive ears because the "Medical Department" has for some time been very aware of the need to either: inform *all* involved parties to communicate directly with the group reasonably expected to have cognizance over a matter (I'd normally assume, in your case, with Dr. Klioze) *or* establish a special multidisciplinary team (with one Head) to concentrate on *all* matters relating to the Shield and its needed improvements. Hopefully, steps in one of these directions can be taken very shortly.
>
> Yes, the Medical Department does agree that the Dalkon Shield is not a sacred cow and that some *systematic* and agreed-on changes can and should be made. While I agree that the Medical Department can contribute to these, it alone does not possess the resources to adequately evaluate all of the suggestions nor to effect all of the steps leading to newer models. Normally, the Medical

Department does not "get into" matters of raw material supply, quality assurance evaluations or production problems, except as these relate to clinical product complaints.

Plaintiffs' Exhibit 337.

These internal memoranda about problems with the tailstring were written at a time when Robins had a great concern about a critical supply situation—a failure to produce enough Shields to fill all of the orders from the salesmen who were being very successful with the marketing plan. Accordingly, suggestions about the possibility of changing the string were rejected in September, 1971, because Robins did not want to slow down production at a time of increasing demand for the product.

Mr. Kenneth Moore, whose education and prior experience was in pharmacy, became the project manager for the Dalkon Shield on October 1, 1971, and served in that capacity to October 1, 1973. In that role, he was responsible for distributing information throughout the company. In preparing himself, Mr. Moore reviewed all of the available information about the product, including the Wayne Crowder memorandum of July 28, 1971. Mr. Moore discussed the tailstring with Mr. Lerner on October 11, 1971, and Mr. Lerner told Mr. Moore that a braided string of nylon and dacron had been tested and rejected because it was found to support bacterial growth in the interstices. Mr. Moore wrote a memorandum about his talk with Mr. Lerner and included a statement that according to Mr. Lerner, the specifications, particularly for shield strength and string strength, had been established on a strictly empirical basis. Mr. Moore also took a trip to Chapstick on October 20, 1971, to discuss the production problems with the string. He learned that some of the problems resulted from a lack of quality control at the German company which was manufacturing and supplying the string material.

John Burke was the man responsible for the sales department at Robins beginning in 1970. He had started with Robins as a salesman calling on physicians, a "detail-man," in 1952. Mr. Burke had gone to Defiance, Ohio to meet with Dr. Earl in the fall of 1970. Because Robins had no previous experience in marketing IUDs or any other contraceptive products, a preliminary market study was done by the Marketing Research Department in August, 1970. In that study, (Plaintiffs' Exhibit 104), it was pointed out that while most contraceptive methods are selected by the patient after consultation with a physician, the physicians reported that about one-half of IUD insertions result from patient requests. It was also observed that while women apparently learn something about IUDs from written material, most information is obtained from conversations with other women. Among the marketing recommendations made in that study was advice that sales to physicians who do not routinely do pelvic examinations, such as general practitioners and osteopaths, can constitute risky business because an IUD in the hands of a physician who is not familiar with reproductive anatomy is almost certain to lead to problems. Also, the study indicated that physicians tend to use a single type of IUD with which they have gained experience and that it is difficult to change them to another.

Burke devised a marketing strategy and brought 15 district managers to Richmond, Virginia, in September, 1970, for an intensive orientation course. A promotional film using Dr. Earl was included in the marketing plan. There was an estimate that 150,000 units would be available for surgical supply dealers in December, and that back-up stock would be produced at a rate of 5,000 to 6,000 units per day. First year sales were estimated to reach at least 500,000 units in the first 12 months. Dr. Earl was used in the training orientation and meetings were held in December, 1970, at Richmond and in Dallas, for orientation of the regional, divisional and district managers. A lay publication plan was also put into effect, for the subtle promotion of the Shield through articles published in such magazines as **Women's Day, Cosmopolitan, Family Circle** and in articles distributed to newspapers.

The marketing strategy was very successful. First year sales exceeded 1 million units, producing revenue of 3.5 million dollars. In a promotional memorandum in the spring of 1972, detailmen were urged to increase their efforts by contacting GP's as well as OB/GYN's.

Dr. Chremos established a plan for a prospective clinical study of women using the Dalkon Shield in October, 1970. It came to be known as the Ten Investigator Prospective Study. Robins' primary purpose was to develop data in anticipation of governmental regulatory requirements for IUDs—a development which Robins then expected to occur in the near future. Dr. Chremos thought there was a need to follow 2,000 women for at least 2 years. The study did not develop reliable data. It was flawed in both conception and execution. Robins lost interest in it when the threat of governmental controls disappeared.

The medical literature available prior to the defendant's marketing efforts included reports of higher than anticipated pregnancy rates for other IUD devices (some greater than 2.7%), reports of perforations with IUDs and reports of pelvic inflammatory disease and uterine infections associated with the use of IUDs. Pelvic inflammatory disease ("PID") is a non-specific phrase used to describe infections of the upper genital tract. The most common symptoms of such infections are lower abdominal pain, fever, adnexal tenderness on examination, adnexal masses and vaginal discharge. There also were reports of septic abortions with other IUDs before Robins began marketing the Dalkon Shield. Septic abortion describes a condition in which a pregnant woman becomes infected and the infection kills the fetus which is then expelled in a spontaneous abortion. Despite this literature, Robins' monitoring program was essentially a passive one, simply collecting adverse reaction reports as they came in, and making bland, noncommittal responses.

Kenneth Moore attended a meeting of the American Association of Planned Parenthood Physicians in April, 1972. At that meeting, Dr. Hugh Davis presented a paper on the experience with the small size Dalkon Shield in nulliparous patients, and there were other presentations about the Shield. A memorandum prepared by Mr. Moore, dated April 17, 1972, referred to a speaker, Dr. Michael S. Burnhill, on the subject of endometrial infection, including his statement of an impression that intrauterine devices caused progressive endometritis resulting in the development of tubo-ovarian abscesses. Mr. Moore discounted that presentation, and praised Dr. Davis for putting Dr. Burnhill "down hard" for a statement that it was a well-known fact that certain types of tails caused PID. Dr. Davis had countered by saying that such tails were of the braided or woven variety, that this had been known since the days of the IUD pioneer, Grafenberg, and that there were no problems in the use of either a monofilament string or a sheath-covered string.

As previously mentioned, the consultant who had been the spokesman for Robins at numerous medical meetings, Dr. Earl, sent the letter of June 23, 1972, addressed to John Burke (Plaintiffs' Exhibit 530), but Robins made no attempt to evaluate the significance of what Dr. Earl was reporting. The letter was not a report of mid-trimester septic abortion because it specifically refers to women who experienced an abortion and "became septic." It did, however, advise of the importance of correlating data with other investigators and that advice was not followed. The information was not properly processed and relayed to appropriate personnel within the Robins organization. Moreover, lacking any prior experience with OB/GYN, those persons, including Dr. Ellen Preston, did not appreciate the importance of carefully monitoring all of the signs and symptoms experienced by the women who were wearing this experimental device.

In October, 1972, Dr. Ellen Preston received a report from a detailman who attended a meeting of District 5 of the American College of OB/GYN in Indianapolis, Indiana, who informed that among the physicians visiting the booth, the negative comments concerning the Dalkon Shield outnumbered the positive comments. Those

negative comments included complaints of high pregnancy rates, acute pelvic inflammatory infections, perforations, increased ectopic pregnancies, irregular menstrual periods, post-insertion absence of menstrual period, and others. The established routine for handling adverse reaction reports at Robins was to make a rather bland reply to the physician or other source generally emphasizing the importance of following the protocol for insertions, and then to make periodic summaries of the reports. There was no systematic effort to evaluate the possible significance of these reports or to transmit them to the physicians involved in the Ten Investigator Prospective Study.

In March, 1972, the project manager, Kenneth Moore, asked the analytical research group to find a suitable substitute for the tailstring material. No substitute was found. By 1973, Robins had knowledge that there had been some problems with string breakage, according to reports from the field, and that such breaks occurred around the second knot, suggesting the possibility that the nylon was losing its integrity after several months *in situ.* String breakage also presented the possibility of spillage of bacteria from inside the string.

Dr. Howard Tatum is a retired OB/GYN who taught at medical schools in Oregon and Louisiana before he became associated with the Population Council, a non-profit organization which provides information concerning contraception, family planning and population mechanics. His primary work for the council has been in the development of new contraceptive modalities and he is the inventor of a "T" platform for use as the central component of an IUD which was in competition with the Dalkon Shield. Dr. Tatum conducted some experiments on the wicking possibilities of the Shield tailstring in 1974. He wrote the results in an article which was published with some errors in it. Dr. Tatum expressed the opinion that the Shield tailstring structures provide a route of ascent of bacteria from the vagina which are then harbored in the string and may be released through breaks in the sheath or from the end of the string inside the uterus.

Dr. Robert Tankersley, Jr. has a Masters degree in bacteriology and a Ph.D. in medical microbiology. He is not a physician. He headed a section at Robins which applied microbiological research techniques in developing tests for product safety. No one in his group carried out any bacteriological safety studies on the Dalkon Shield tailstring from the time the device was purchased in June, 1970, to the time that it was removed from the market in June, 1974. No one at Robins gave him the wicking theory for analysis, and the first that he was involved with bacteriological testing was in August, 1974, after Dr. Tatum's test results had been reported to Robins, but before they appeared in the medical literature. Dr. Tankersley went to New York to see Dr. Tatum in August, and discussed his results. Dr. Tankersley was critical of Dr. Tatum's work because of the methods which he used.

Dr. Tankersley directed some tailstring microbiological tests. Dr. Tankersley's results show some ascension of bacteria up the string under different conditions, and indications that the transport reaches a maximum height and then recedes. That is in conflict with Dr. Tatum's view that it continues to ascend. Dr. Tankersley did not find any essential difference between the Dalkon Shield string and the monofilament strings. He did fluid-to-air studies and fluid-to-fluid studies. In the fluid-to-fluid test, there was one sample indicating that bacteria may be transported throughout the length of the Dalkon Shield tailstring. There were definite methodological flaws in the testing done at Dr. Tankersley's direction.

On May 8, 1974, Dr. Frederick Clark, as Medical Director for Robins, issued a "Dear Doctor" letter on the subject of second trimester septic abortion with the Dalkon Shield. (Plaintiffs' Exhibit 849). In that letter, Dr. Clark said that since marketing the Dalkon Shield late in 1970, Robins had become aware of 36 cases of septic abortion in patients purportedly wearing the Dalkon Shield, and that 4 such cases resulted in maternal fatalities. The letter also reported that an estimated 2,200,000

Dalkon Shields had been in use and that the company intended to explore every reasonable approach to determine if any unique relationship existed between the Dalkon Shield and septic abortion. The letter recommended that in the management of patients with Dalkon Shields, the device should be removed as soon as pregnancy is confirmed if removal could be accomplished by traction with the string. If not, serious consideration should be given to offering a therapeutic abortion, and if that is refused, the patient should be warned of the possible risk of continuing the pregnancy. If the pregnancy is continued, Robins recommended following the patient very closely for early signs of potential severe complications. Additionally, the company suggested that any patient to be considered for the Dalkon Shield should be advised prior to the procedure that a therapeutic abortion may be recommended in the event of an accidental pregnancy.

On June 11, 1974, Robins, through Dr. Clark, presented a statement on the subject of septic spontaneous abortion and the Dalkon Shield to the Food and Drug Administration, acting through an OB/GYN device panel (Plaintiffs' Exhibit 858), and in that document, included the following statement:

It is generally accepted that the contraceptive action of IUDs results at least in part from the inflammatory response induced, and that the duration of exposure to the IUD is an important factor in this response. Golditch[8] has suggested that in some patients this progressive endometrial response may decrease local resistance to bacterial insult and encourage the gradual development of pelvic inflammatory disease. This pre-existing local pelvic infection could then become a factor in the occurrence of septic abortion. As Golditch has stated, it is very hard to determine the true incidence of pelvic infection related to an IUD, but he suggests that it may be higher than that generally thought.

[8] I. Golditch and J. Huston. Serious pelvic infections associated with intrauterine contraceptive devices. Int. J. Fertility *18* (3), 1973, pp. 156–60.

On June 28, 1974, Robins voluntarily suspended domestic distribution and sale of the Dalkon Shield in response to a request by the Food and Drug Administration. Thereafter, without acceding to the FDA's authority or entitlement to request such information, Robins participated in proceedings concerning the Dalkon Shield and, on August 8, 1975, it announced that it would not remarket the Dalkon Shield.

On September 25, 1980, Dr. Fletcher Owen, Jr., the then director of medical services for Robins, issued a "Dear Doctor" letter which in its entirety reads as follows:

Subject: Recommendation that the Dalkon Shield be removed from asymptomatic patients

Dear Doctor:

Domestic distribution of the Dalkon Shield by the A.H. Robins Company was discontinued in June 1974. Subsequently, we have concurred with the majority of medical opinion relative to IUDs in suggesting that women who continued to use the Dalkon Shield without problems or difficulties need not have it removed. At the same time we have followed the medical literature regarding, among other possible IUD associated complications, the relative risk of pelvic inflammatory disease among IUD-users compared to non-users and, lately, the relationship, if any, between duration of IUD use and pelvic infection.

The medical literature does not establish a firm relationship between the duration of use of inert IUDs and an increased risk of pelvic infection generally; but a relationship has been suggested by recent literature, particularly when the causative organism is **Actinomyces israelii.** Cases of pelvic actinomycosis which cannot be explained on the basis of direct extension from the gastrointestinal tract have been observed most commonly among long-term IUD users.

**Actinomyces israelii** is an anaerobic, gram-positive bacterium which forms mycelia that may fragment into bacillary and coccoid forms. The organism is difficult to culture. Identification is most

often made on the basis of immunofluorescence, special stains, or a finding of typical "sulfur granules" in the involved tissues.

Pelvic actinomycosis is usually insidious in onset and clinical symptoms may be absent until a pelvic mass is noted on examination. By this time, advanced disease of the tubes, ovaries or uterus may be present. The infection has been reported in users of a variety of IUD types. Recent reports have indicated that the problem can be minimized by replacing inert IUDs at periodic intervals, generally not exceeding three years. [Schmidt, W.A., *et al.* "Actinomycosis and intrauterine contraceptive devices—The clinicopathologic entity" Diagnostic GYN and OB II (3) 165–177 (Fall) 1980 (in press); Duguid, H.L.D.; Parratt, D.; Traynor, R. "Actinomyces-like organisms in cervical smears from women using intrauterine contraceptive devices" Br.Med.J. 281 (6239) 534–37 (Aug. 23) 1980.]

Since any present users of the Dalkon Shield are in the long-term use category, we now recommend removal of this IUD from any of your patients who continue to use it, even though they may not be experiencing any pelvic symptoms at this time. We further suggest that the removed IUD and adherent material be submitted to a clinical pathology laboratory for examination for organisms consistent with actinomycetes. If present, the patient should be carefully followed and, where clinically indicated, appropriate therapy administered.

Plaintiffs' Exhibit 1287.

That letter was received in evidence in this case for the limited purpose of showing that Robins acknowledged medical literature in which there was a reported association between pelvic actinomycosis and long-term IUD use.

## LABELING HISTORY

Pharmaceutical companies market their products through physicians as intermediaries with the users. Accordingly, important product information is distributed through package inserts and physician file cards. The product information about the Dalkon Shield is important to the issues in these cases.

The 1970 package insert issued by the Dalkon Corporation contained the following information under the heading "Removal":

There is a tendency for all intra-uterine devices to accumulate small deposits of calcium on the surface and for the strength of the materials to become compromised in time. At the end of two years replacement with a fresh Dalkon Shield is recommended.

In that package insert, under "Recommended Protocol," there was this:

Recent reports from clinical investigators strongly recommend adjunctive use of a spermacidle foam, jelly or cream to enhance contraceptive effectiveness during the first three months after insertion of the Dalkon Shield.

Plaintiffs' Exhibit 18.

The first package insert from Robins was September, 1970, and it referred to "lowest pregnancy rate 1.1%." Mention was made of the construction from flexible, resilient plastic that readily conforms to the shape of the uterine cavity and bends and gives with uterine contractions. Under the heading "Overall Superiority to the Pill" was the following:

The Shield provides safe, sure, sensible contraception. It prevents pregnancy without producing any general effects on the body, blood or brain, and cannot cause weight gain, depression, or headache. Furthermore, it does not disrupt normal menstrual periods or alter hormonal balance.

Plaintiffs' Exhibit 118.

The first Robins package insert did not include the recommendation for the use of adjunctive spermacidle foam. In November, 1971, in a physician file card, the defendant did include a caution that:

Clinical experience indicates that the risk of accidental pregnancy with IUD's is higher during the first two or three menstrual cycles following insertion. Therefore, many authorities recommend the

use of a supplemental contraceptive method during this interval.

Plaintiffs' Exhibit 379.

The July, 1972 labelling included the following paragraph under the word "Action":

> While the exact mode of action by which IUD's prevent pregnancy is not completely understood, many authorities believe the IUD acts as a foreign body, inducing a local inflammatory reaction. This reaction causes alterations in the uterine milieu which are unfavorable to conception. Clinical data on the Dalkon Shield indicates that it prevents pregnancy in approximately 98% of patients.

Then, under "Clinical Data," the following pregnancy rates were given under the names of four investigators:

> *Davis:* 1.1%
> *Earl:* 0.5%
> *Ostergard:* 1.1%
> *Gabrielson:* 1.9%

Under "Warnings," there were two new matters. A warning of a relatively low level of radiopacity and, "Reports indicate that a Dalkon Shield not in its high fundal position may not provide anticipated contraceptive effect." Also, under "Precautions," there was reference to the risk of accidental pregnancy during the first two or three menstrual cycles, and the recommendation of the use of a supplemental contraceptive method, such as spermacidal foam or gel. There was also a statement that the need for removal or replacement is dictated largely by patient tolerance. Under "Adverse Effects," was included the word "Infection." Also, there were specific insertion instructions with the following under the word "Important":

> The contraceptive effectiveness of the Dalkon Shield depends on its proper placement high in the uterine fundus. In order to achieve this, specific insertion instructions are recommended. Please, follow these instructions on the next four pages carefully!

There was also the recommendation that the patient be instructed to check for the presence of the string, particularly after each period and for reexamination by the physician after the first menses, at six month intervals thereafter, and at any other time that the patient has reason to suspect that the Dalkon Shield is not in proper position.

Plaintiffs' Exhibit 542.

In the October, 1973 physician file card, there was a summary of clinical study data "analyzed by the life table method" from published articles. There was also the statement, "Event rates for the Dalkon Shield and all other IUDs vary between insertors for reasons which have not been positively identified." The pregnancy event rate was given as varying from 0.5 to 5.1 for different lengths of use.

Under "Contraindications," there was added:

> Acute or subacute pelvic inflammatory disease. Acute cervicitis. Known or suspected cervical or uterine neoplasia. History of infected abortion or postpartum endrometritis within previous six weeks. Recent history of abnormal uterine bleeding.

Then, under "Warnings," there appeared the following:

> Severe sepsis with fatal outcome, most often associated with spontaneous abortion following pregnancy with a Dalkon Shield *in situ* has been reported. In view of this, serious consideration should be given to removing the device when the diagnosis of pregnancy is made with a Dalkon Shield *in situ.*

Also, under "Warnings":

> The proportion of pregnancies which terminate in spontaneous abortion is considerably higher in the presence of IUD's.

Under "Adverse Effects," there was this statement:

> Major adverse effects include excessive bleeding, pelvic inflammatory disease, and embedment.

Then, after "Less Serious effects," there was the following:

> Septic abortion has been reported. Latent infections may be aggravated by an IUD.

Defendant's Exhibit Y–10.

Robins published patient information sheets in 1970, 1971 and 1972. In the September, 1970 issue there are these questions and answers which seem most pertinent:

**How does an IUD prevent pregnancy?**
The device is thought to prevent pregnancy by causing the egg to dissolve and pass away just as it does normally every month during mensturation.

**Are the IUD's safe?**
Many leading authorities believe they are the safest method of effective contraception available today. Unlike the Pill, they do not produce generalized side effects, such as headaches, blood clots, depression, breast tenderness, hair loss, weight gain, decreased sexual desire, etc.

**Is the Shield as effective as the Pill in preventing pregnancies?**
The pregnancy rates with the modern pills and the modern IUD are similar. The Shield prevents 99% of pregnancies, as do most oral contraceptives.

**How soon will the Dalkon Shield be effective?**
Immediately after insertion.

**How long can I wear the Shield?**
Women have worn IUD's for 5 years or longer, but many authorities recommend changing to a new one after 2 years.

Also included under a list of advantages was this statement:

Safe Protection: IUD's are being used by millions of women throughout the world and have demonstrated outstanding medical safety. In the presence of the IUD, the lining of the womb undergoes a slight change sufficient to prevent pregnancy. That is all. The IUD produces no widespread effects on the body systems.

Plaintiffs' Exhibit 117.

In the October, 1972 patient information sheet, in answer to the question, **How does the Dalkon Shield prevent pregnancy?**, there is this quote:

Exactly how the Dalkon Shield or any IUD prevents pregnancy is not completely known. Current medical opinion suggests that the IUD changes the womb in such a way that either the egg is not fertilized by the sperm or if it is, the fertilized egg cannot implant itself in the wall of the womb. Available evidence indicates that IUD's do not act by causing abortion.

Then on the question, **How effective is the Dalkon Shield?:**

Medical studies on thousands of women indicate that the Dalkon Shield is approximately 98% effective in preventing pregnancy. In a few isolated studies, pregnancy rates of more than 2% have been reported.

Then, the question, **If I should become pregnant with the Dalkon Shield, will the baby be harmed?:**

When pregnancy does occur, the bag of water pushes the IUD to one side and the developing baby is not really touching the device at all. There is no evidence that the frequency of abnormal births is any greater among women wearing IUD's than among women not wearing IUD's.

Plaintiffs' Exhibit 590.

The objective of Robins to make and sell the maximum number of Dalkon Shields was most clearly expressed in an eight-page advertisement for medical journals which was labeled as a "Progress Report" in which the company boasted that in less than two years the Dalkon Shield had become the contraceptive method of choice for many private physicians and family planning organizations. In that "Progress Report," Robins asked the question "**Who are candidates for the Dalkon Shield?**" and gave the following answer:

The applications of the Dalkon Shield are so universal that they cut across all socio-economic lines. They include all women who are not sufficiently motivated to take the Pill, ranging from the clinic patient to the busy mother-career woman who has so many activities and interests that taking a pill simply slips her mind. They also include your patient who is so disorganized she can't seem to get anything done on schedule.

A prime candidate is the young nullip who will settle for nothing less than the

**1306**

most modern, trouble-free method of birth control. For her the Dalkon Shield is the logical IUD because it is also available in the smaller, nulliparous size. In fact, the Shield is the only IUD which has been anatomically engineered to fit the smaller uterine cavity of the nulliparous woman. Other IUD's have proved unsatisfactory because the patient cannot tolerate them. In addition to involuntary expulsions, severe cramping and bleeding has necessitated their removal for medical and personal reasons. Already more than 300,000 of the nulliparous size Shields have been sold.

Other candidates for the Shield include that large segment of women who cannot tolerate oral contraceptives, especially on a long-term basis because of the troublesome side effects. Some of these are patients whom you believe should be taken off the Pill; others may have asked you to substitute another method of birth control. Again, the Dalkon Shield is the contraceptive method of choice because it has no general effects on the body, blood, or brain. It cannot alter hormonal balance—cause depression, headache, weight gain, or fluid retention. Sustained menstrual irregularities are rare.

The modern woman also wants to be liberated from troublesome birth control devices such as the diaphragm. A few women can't use a diaphragm; many dislike the procedure of having to insert and remove it. Some may worry over whether or not it is in place. Not only is the Dalkon Shield a more effective contraceptive method than the diaphragm, condom, creams, foams, and jellies, but there is nothing to do before or after sexual relations. Neither partner is aware of its presence. In no way does it interfere with recommended feminine hygiene practices.

With the Dalkon Shield the patient can throw away her calendars, charts, and dispensers. No longer must she remember to take along her medication when she goes on a trip. She makes just one decision—to have the Dalkon Shield inserted. From this moment on, she is protected 24 hours a day.

Plaintiffs' Exhibit 576.

## DETERMINING LIABILITY

These cases are governed by Colorado law. Each plaintiff seeks relief under multiple claims. These are: (1) product liability under Restatement (Second) of Torts § 402A, (2) negligence in design and testing, (3) negligent failure to warn, (4) strict liability for product misrepresentation under Restatement (Second) of Torts § 402B, (5) fraud, (6) fraudulent concealment, (7) breach of express warranties, (8) breach of implied warranty of merchantability and fitness for a particular use, and (9) conspiracy. Each of the plaintiffs has included a claim for punitive damages under C.R.S. § 13–21–102.

■ Colorado has adopted the doctrine of enterprise liability for defective products articulated in Restatement (Second) of Torts § 402A (1965). *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975). Under that doctrine the manufacturer or seller of a product is liable for injury to a user of that product if the product was defective and because of the defect it was unreasonably dangerous to the user.

The very essence of the doctrine of strict liability for defective products is that people ought to be able to rely on their reasonable expectations about a product. The Colorado Supreme Court succinctly summarized the law in the following paragraph in *Jackson v. Harsco Corp.*, 673 P.2d 363 (Colo.1983):

We adopted the doctrine of strict liability as stated in *Restatement (Second) of Torts, 402A. Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975). Products liability under section 402A does not rest upon negligence principles, but rather is premised on the concept of enterprise liability for casting a defective product into the stream of commerce. *Kinard v. Coats Co., Inc.*, 37 Colo.App. 555, 553 P.2d 835 (1976); Klemme, *The Enterprise Liability Theory of Torts*, 47 U.Colo.L.Rev. 153 (1975). Thus, the focus is upon the nature of the product,

and the consumer's reasonable expectations with regard to that product, rather than on the conduct either of the manufacturer or of the person injured because of the product. *Bradford v. Bendix-Westinghouse Automotive Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973). Strict liability is applicable to an otherwise properly manufactured product if its design renders it unreasonably dangerous. *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978). *Id.* at 365–366.

A product may be defective because of its design, the way it is manufactured or the way in which it is sold to the user. The Dalkon Shield was a defective product because of a combination of reasons which concern all three of these bases for liability as a defective product. In considering whether the Dalkon Shield was a defective product, it is appropriate to consider the issues of manufacture, design, warnings and directions for use in combination.

In the dispute over the Dalkon Shield, what is unknown is far more significant than what is known. It is undisputed in the evidence that medical science has been unable to explain and prove why any IUD is effective in preventing conception. The most prevalent theory is that the body's natural defense of an inflammatory response to a foreign object in the uterus is the effective mechanism. That hypothesis was adopted as the central consideration in the design of the IUDs which have been considered in this trial. The Dalkon Shield was designed to inflame the endometrial tissue to a greater extent than other IUDs by increasing the area of surface contact and by ensuring placement in the broad area of the fundus through the expected action of the lateral fins. The design was also constructed to resist expulsion.

To be unreasonably dangerous a product must be dangerous to an extent beyond that which would be contemplated by the ordinary user, with the ordinary knowledge as to its characteristics common to the community. Restatement (Second) of Torts § 402A comment i. If a product is dangerous and the danger is one not generally known, the manufacturer is required to give warnings, if he has knowledge of the danger, *or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the danger.* Restatement (Second) of Torts § 402A comment j.

█ The defect in the Dalkon Shield is that when it was being manufactured and sold by Robins, the company did not know what health hazards might be inherent in the apparently increased effectiveness of this product over other IUDs as it appeared in Dr. Davis' paper. Yet, Robins not only failed to disclose its lack of knowledge; it affirmatively asserted that the Shield was safe.

The Dalkon Shield is unreasonably dangerous because Robins could have learned about and warned of such dangers with the application of the reasonable skill and foresight expected of an established pharmaceutical company. With adequate testing, controlled studies and cautious marketing, Robins could have discovered the increased risks which have been shown to be inherent in the Dalkon Shield's unique new design.

Robins bought the Dalkon Shield without any prior experience in the field of contraception and without an OB/GYN on its medical staff. Whatever may have been the state of knowledge within the medical profession about IUDs at that time, Robins had no awareness of it. Additionally, Robins made no effort to acquire such knowledge. The defendant relied entirely on Dr. Earl Davis, who had not only the pride of invention, but also a personal incentive to bias his judgment and whose limited study was based on data concerning only 640 women for a one-year period.

The evidence is clear that Robins rushed to mass marketing of the Dalkon Shield without adequate information about the potential risks associated with its use, and without making a reasonable effort to acquire such information and control such risks. Robins' only corporate effort at testing, the Ten Investigator Prospective Study, was undertaken without an adequate design of protocol in distribution of the product, in requirements for physician

follow-up with the patient and in the techniques for reporting and interpreting the results.

There are risks associated with the use of contraceptive methods and products. There is, of course, a risk of pregnancy, which itself presents some danger of morbidity and mortality, as well as possible adverse economic and social effects. In addition to the risk of failure, some forms of contraception involve other health hazards. The pill has been associated with an increased risk of cerebral thrombosis and breast tumors. IUDs, generically, are associated with a higher incidence of pelvic inflammatory disease.

The defendant has sought to avoid liability in these cases by reliance on comment k to the Restatement (Second) of Torts § 402A (1965). Comment k provides an affirmative defense for products which are incapable of being made safe, where the social utility in the use of the product is sufficient to justify the risk. *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo.1983). The determination of social justification is not a matter for the court to decide as a question of policy. It is sufficient that relevant segments of society have made that value judgment. What the law requires is that the decision to use the product be made with sufficient information to arrive at the conclusion after an appropriate risk-benefit analysis. Accordingly, to rely on comment k, a manufacturer must show that the product was properly prepared, and properly marketed, accompanied by appropriate warnings and directions for use. *Id.*

The defendant has not made that showing at this trial. Comment k gives this defendant no comfort because Robins failed to take reasonable steps to control both known and unknown risks. It neither properly prepared nor properly marketed the Dalkon Shield. In this court's view, it would have been reasonable to limit distribution of the Dalkon Shield to OB/GYNs, and to caution those specialists to use it only in patients who practiced good hygiene and with whom there was a sufficient physician-patient relationship to ensure adequate follow-up care. Not only did Robins not make those restrictions; it improperly marketed the Dalkon Shield by actively promoting all physicians, including osteopaths, by providing the Dalkon Shield in core city clinics where no follow-up care would be expected, and by seeking to create product demand among women through a lay publications campaign.

Robins' counsel have cited cases in which the courts have recognized that the need for a product may be so great, even in its experimental stage, that the lack of time and opportunity to develop sufficient clinical experience and medical evaluation to provide some assurance of safety should not inhibit the marketing and use of the product where such experience as there is justifies the taking of the unknown risks to obtain the known benefit. It is suggested that the Dalkon Shield was such an important part of the armamentarium for contraception that such risks were justified. That argument would have more merit if the Dalkon Shield had been the first IUD to be marketed in the United States. It was not. Its presumed contribution was that it was to be a better IUD because it was thought to be a more effective contraceptive. The appropriate phrasing of the risk-benefit question in this case is not whether IUDs generally should be used; it is whether the claimed few percentage points improvement in effectiveness of this new design of IUD was worth the chance that such improvement was at the cost of an increased risk of infection.

Robins was negligent if it failed to do an act or acts which a reasonably prudent pharmaceutical company would do, or did acts which a reasonably prudent pharmaceutical company would not do, under the same or similar circumstances, to protect users of its product from bodily injury. *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984); *Hamilton v. Hardy*, 37 Colo. App. 375, 549 P.2d 1099 (1976), *cert. denied*, May 24, 1976.

The Dalkon Shield was different from the other IUDs available in the United States in 1970. Robins was negligent in

the design, testing and manufacture of the Dalkon Shield. The Dalkon Shield was designed to increase the inflammatory response in the endometrial tissue by increasing the area of surface contact and by ensuring placement in the broad area of the fundus through the expected action of the lateral fins. The design was also intended to resist expulsion by the addition of the lateral projections which made removal more difficult than with other available IUDs. As a result, the tailstring of the Dalkon Shield had to have greater strength which was the reason for using a sheathed multifilament string. That string became a harbor for infectors which overcame the reduced resistance to infection in some women.

At the time that Robins purchased the Dalkon Shield, and during the time that the defendant marketed that device, there was little medical literature concerning the long-term effect of IUD usage. All of the marketed devices were then relatively new to clinicians in the medical profession. When the Dalkon Shield was being manufactured and sold by Robins, the defendant did not know what health hazards might be inherent in the apparently increased effectiveness of this product over other IUDs.

 If a manufacturer of a medical device knows or in the exercise of reasonable care should know that the use of its device may be harmful or injurious and such danger would not be obvious to a physician dispensing the device or counselling or treating patients using it, then the manufacturer is obligated to use reasonable care to warn the medical profession of the danger, and it is negligent if it fails to do so. Such a claim of negligence is distinct from the plaintiffs' claims based on the Restatement (Second) of Torts § 402A (1965). *Hamilton v. Hardy, supra.* Robins was negligent in its failure to warn adequately of the possible risks involved with use of the Dalkon Shield and its failure to disclose its lack of knowledge. It can be said that the warnings and cautions given in Robins' product information to the physicians was representative of what the defendant knew about its product at the time, but the warnings were insufficient

because the defendant did not disclose the depth of its ignorance. A reasonably careful manufacturer of a new and untested device to be placed in the uterus would take precautions to alert physicians and women to be alert to any sign or symptom of any possible adverse reactions and to respond to reports of such reactions by testing for possible causal relationships. The medical profession was not made aware of Robins' lack of knowledge about this new product which it was touting to them. It must be remembered that Robins had an established reputation as a pharmaceutical company familiar to the doctors. They could not reasonably be expected to assume that such a reputable company would be promoting the use of a medical device which should have been considered to be in an experimental state.

In many respects, the story of the Dalkon Shield is an illustration of the individual indifference which seems inherent in large bureaucratic organizations. The many intra-company documents which have been introduced into evidence at this trial show a pattern of passing only partial information among people in the marketing, medical and manufacturing departments without any central coordination. That has been illustrated best by Plaintiffs' Exhibit 337 quoted at pages 1298 and 1299, *supra.* Indeed, if there were a dominant department it would appear to be the marketing group. The paramount corporate objective was to achieve market dominance in a product in which the defendant was a new competitor. That objective produced imperatives which flawed the company's performance in all of the areas which could have made a difference.

Colorado has adopted the doctrine of strict liability for misrepresentation of a product set out in section 402B of the Restatement (Second) of Torts, which provides:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold

by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

The Colorado Supreme Court, in *American Safety Equipment Corp. v. Winkler*, 640 P.2d 216 (Colo.1982), explained the policy underlying section 402B liability:

In our view, the rationale behind such a policy is most persuasive in our complex society where manufacturers offer apparently similar but, in reality, fundamentally different products. It is the manufacturer who, through the design and testing of his products, knows of their particular qualities and capabilities. A consumer, on the other hand, knows only the information he has been able to glean from the manufacturer's marketing materials. Because of his superior knowledge, the manufacturer should not be permitted to avoid responsibility for his misrepresentations to the consumer, even though the misrepresentations were neither fraudulently nor negligently made.

Further, imposing strict liability on manufacturers who misrepresent their products does not impose an undue burden. A manufacturer intends to reap economic benefit from the public representations it makes regarding the character and quality of its products, and must assume the economic consequences for physical harm resulting from misrepresentations it has made about its products. Manufacturers should not benefit economically from representations they make to the public and, at the same time, be insulated from liability for misrepresentations which result in physical harm. *Id.* at 220–21.

A claim based on section 402B is distinct from the strict tort liability doctrine articulated in section 402A. "The representational theory of section 402B requires neither a defective product nor one that is unreasonably dangerous." *Id.* at 219.

To find liability based on section 402B there must be a misrepresentation of a material fact concerning the character or quality of a chattel, the misrepresentation must be made to the public, and physical harm must have resulted to a consumer from justifiable reliance upon the misrepresentation. *Id.* at 222. A fact is material if a reasonably prudent physician or patient under the circumstances would attach importance to it in determining his or her course of action. A misrepresentation may be made by any oral or written words and conduct, or a combination of words and conduct, which create an untrue or misleading impression in the mind of another.

The evidence establishes that Robins misrepresented material facts to the public concerning the safety and effectiveness of the Dalkon Shield by presenting the Dalkon Shield as a totally carefree contraceptive device for all categories of women wanting to avoid pregnancy. That is best illustrated by the eight page "Progress Report" discussed at pages 1305 and 1306, *supra.* Robins said that the Dalkon Shield did not produce "any general effects on the body," it was 99% effective in preventing pregnancy and unlike other IUDs was easily tolerated by all types of potential users. The evidence shows that those statements were not true.

The evidence further establishes that the physicians and health care agents who inserted women with the Dalkon Shield justifiably relied on Robins' representations. Robins is a well-known pharmaceutical company which exclusively manufactured and marketed the Dalkon Shield, and Robins was the source of information concerning this new IUD. The reputation of Robins, and physicians' acceptance of this product gave women the legitimate expectation that the Shield would not be provided to them unless this company and the medical profession knew that it was effective and safe.

The defense in this case has urged that this court take a narrow and restricted view of both the law and the evidence, contending that the plaintiffs have failed to prove specific reliance on particular product information, such as the physician file cards, package inserts or patient sheets. These items do not constitute the extent of Robins' misrepresentation in the promotion of the Shield, and a particular plaintiff's failure to produce evidence of the exact representation or method of presentation does not defeat her claim for product misrepresentation. Robins launched a massive promotional campaign in 1970 to achieve wide acceptance of the Dalkon Shield as the preferred IUD. Through presentations at medical meetings, distribution through planned parenthood groups, newspaper reports, articles in women's magazines, and advertising in medical journals, the Robins message reached a large audience. In addition, its detailmen aggressively promoted the product to many physicians who had little knowledge of gynecology. The result can be considered a tribute to the effectiveness of the marketing strategy. The Dalkon Shield did become the best known and most widely used IUD. The unexpected consequence was to place many women at an unknown risk of injury. This "carefree" contraceptive was made and marketed by a careless company.

Colorado's Product Liability Act, C.R.S. §§ 13–21–401—406, applies to four of these cases. The effective date of the Act was July 1, 1977, and the causes of action for plaintiffs Winchester, Whitney, Dickens and Cornelisse arose after that date. The relevant sections, C.R.S. § 13–21–403 and C.R.S. § 13–21–404, provide in pertinent part:

> **13–21–403 Presumptions.** In any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product:
>
> (a) Prior to sale by the manufacturer, conformed to the state of the art, as distinguished from industry standards,

applicable to such product in existence at the time of sale ...

> **13–21–404 Inadmissible evidence.** In any product liability action, evidence of any scientific advancements in technical or other knowledge or techniques, or in design theory or philosophy, or in manufacturing or testing knowledge, techniques, or processes, or in labeling, warnings of risks or hazards, or instructions for the use of such product, where such advancements were discovered subsequent to the time the product in issue was sold by the manufacturer, shall not be admissible for any purpose other than to show a duty to warn.

A "product liability action" is defined as "any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury ... caused by or resulting from the manufacture, ... design ... testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product." C.R.S. § 13–21–401.

There is little judicial precedent to guide application of this statute. The rebuttable presumption of "no defect" is only to be considered as some evidence of no defect. "The presumption embodied in section 13–21–403(1)(a), ... acts as rebuttable evidence of the non-defectiveness of any product which may be the subject of a products liability action." *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118, 126 fn. 14 (Colo.1983). The plaintiffs have introduced sufficient evidence to rebut the presumption and the evidence is sufficient to outweigh the evidence of no defect, including the presumption.

The Colorado Supreme Court in *Belle Bonfils Memorial Blood Bank v. Hansen, supra,* concluded that the presumption does not apply in the case of a product which is claimed to be unavoidably unsafe under the comment k affirmative defense

of the Restatement (Second) of Torts § 402A because comment k provides complete immunity from liability for the narrow range of defective products which are unavoidably unsafe. The assertion of the comment k defense is in the nature of a confession and avoidance; it is an admission that the product is defective and the burden of proof for the elements of the comment k defense is on the manufacturer. As earlier noted, Robins has not met that burden at this trial.

The plaintiffs have included two claims sounding in deceit or fraud: fraudulent misrepresentation and fraudulent concealment. Robins may be found liable if it made a misrepresentation of a material fact concerning a character or quality of the Dalkon Shield, which was communicated to or intended to reach the public through the medical profession by advertising, labels, detailmen, or otherwise. A claim for fraudulent misrepresentation is identical to a claim based on section 402B of the Restatement (Second) of Torts with the added requirements that Robins made the representations knowing them to be false or with a reckless disregard of and indifference to their truth or falsity, and with the intent that the plaintiffs act in reliance on the representations. *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937).

In Colorado, a defendant may be liable for fraudulent misrepresentation not only for intentionally misrepresenting facts which it knows to be false but also for misrepresenting facts with reckless disregard for or ignorance of their truth or falsity. *Id.; Otis & Co. v. Grimes*, 97 Colo. 219, 48 P.2d 788 (1935). The evidence does not support a finding that when it began marketing the Dalkon Shield Robins knew that its claims regarding safety and effectiveness were false. Robins' representations concerning the safety and effectiveness of the Dalkon Shield proved to be materially false and were made with reckless ignorance of their truth or falsity because of the failure to test the Dalkon Shield and its component parts prior to the marketing campaign, and the failure to place adequate controls on the product's use. The company not only failed to disclose its lack of knowledge, it affirmatively asserted that the Dalkon Shield was safe, implying full knowledge of all possible consequences.

Fraudulent concealment requires proof that Robins failed to disclose a past or present fact which in equity and good conscience should have been disclosed, that Robins knew that it was concealing such a fact, and that Robins did so with the intent that the plaintiffs act on the concealment. *Teodonno v. Bachman*, 158 Colo. 1, 404 P.2d 284 (1965); *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964).

Fraudulent concealment has not been established in this case. What was not disclosed was the lack of testing and controls, but Robins' failure was not due to an intent to induce reliance on a knowingly concealed fact. It was due to a lack of awareness of the significance of the unknown potential for injury from this product. Fraudulent concealment implies the intent to conceal what is known with an awareness that such facts are important to the user. Robins was not, itself, aware of the importance of its ignorance and, therefore, the failure to reveal it is not a separate tort of fraudulent concealment. Robins deceived itself and acted on unwarranted assumptions.

The plaintiffs claim a breach of express warranty under C.R.S. § 4-2-313, because through advertising materials, labeling, detailmen, and other means, Robins expressly assured that the Dalkon Shield was safe and superior to other intrauterine devices. The plaintiffs also assert that Robins breached implied warranties of merchantability and fitness for a particular purpose to give rise to claims under C.R.S. §§ 4-2-314 and 315.

A seller's warranty, whether express or implied, extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by the breach of the warranty. C.R.S. § 4-2-318. To recover for personal injuries due to a breach of warranty,

a person to whom the warranty extends must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from that remedy. C.R.S. § 4–2–607(3)(a). *Rich's Restaurant, Inc. v. McFann Enterprises, Inc.*, 39 Colo.App. 545, 570 P.2d 1305 (1977), *cert. denied*, Nov. 7, 1977. The timeliness and adequacy of notice are fact questions to be determined in the context of the circumstances of the case, and the buyer has the burden of proof. *White v. Mississippi Order Buyers, Inc.*, 648 P.2d 682 (Colo.App.1982).

■ The "seller" as the term is used in C.R.S. § 4–2–607(3)(a) refers to the immediate seller who delivered the goods to the buyer. Timely notice of the breach to the immediate seller is all that is required. Separate notice to the seller's supplier or the manufacturer is not necessary. In *Palmer v. A.H. Robins Co., supra,* the Colorado Supreme Court held that a physician who inserted the Dalkon Shield and included the cost of the Shield in his fee is the immediate seller and notice to him or his knowledge of the injury is adequate.

■ None of the plaintiffs introduced evidence that she notified Robins of a breach of warranty prior to filing suit. The evidence establishes that only Mrs. Catto and Mrs. Frisk returned to the physician who had inserted the Dalkon Shield for follow-up consultation when they had adverse effects. The other plaintiffs have failed to meet their burdens of proof that notice was given to the seller within a reasonable time because they failed to notify either the physician who inserted the Shield or Robins.

■ The question remains whether the acts of Mrs. Catto and Mrs. Frisk were sufficient to inform their treating physicians of a breach of warranty and whether their claims based on breach of warranty are barred by the applicable statute of limitations. There is no prescribed format for notice of breach. *Hoffman's Double Bar Pine Nursery v. Fyke*, 633 P.2d 516 (Colo. App.1981). A person gives notice by taking reasonable action to inform in the ordinary course of business whether or not actual notice results. C.R.S. § 4–1–201(26). The facts must be evaluated in light of the purposes for a notice requirement. *Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo. 1980).

■ If these plaintiffs presented themselves to their original treating physicians with symptoms which the physician thought were caused by the Dalkon Shield, the notice requirement is satisfied under Colorado law. *Palmer v. A.H. Robins Co., supra.*

■ The fact that a woman became pregnant with the Shield does not, in itself, constitute a breach of warranty. The Dalkon Shield was not presented to the public as being 100% effective in preventing pregnancy, and it is not possible from the evidence presented to determine from the fact of a single pregnancy that the Shield did not function as represented. However, Robins' promotional material did expressly represent that if a woman became pregnant with the Dalkon Shield, there would not be added risks above the known risks of pregnancy.

■ The limitation period for a claim based on breach of warranty is four years. C.R.S. § 4–2–725. The statute provides in part:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. This period of limitation may not be varied by agreement of the parties.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made; except, that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

Robins' assertions about the Dalkon Shield did extend to future performance of the Shield; therefore, any cause of action for

**1314**

breach of warranty would accrue at the time that the breach of warranty was discovered or should have been discovered.

An express warranty by the seller is created through:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.... C.R.S. § 4-2-313.

It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty; but a mere affirmation of the value of the goods or a statement of the seller's opinion or recommendation of the goods does not create a warranty. C.R.S. § 4-2-313.

■ A warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be merchantable, goods must conform to the promises or affirmations of fact made on the container or label, if any. C.R.S. § 4-2-314. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. C.R.S. § 4-2-315. A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the buyer; whereas, the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. *Palmer v. A.H. Robins Co., supra* (citing official comment to C.R.S. § 4-2-315.) An implied warranty of merchantability and implied warranty of fitness for a particular purpose may coexist when there is suffi-

cient evidence to support the creation of each warranty. *Id.*

Determination of the plaintiffs' warranty claims must focus on the events surrounding each plaintiff's decision to use the Shield and her particular injury. The warranty claims for the two plaintiffs who did satisfy the notice requirement will be addressed in the discussion of each individual plaintiff.

■ The plaintiffs allege that Robins "conspired with others with the object of selling Dalkon Shields by the use of false, misleading, and fraudulent promotion, advertising, distribution, and labeling of Dalkon Shields, which was directed both to the medical profession and the general public," and that as a direct and proximate result of this civil conspiracy, the plaintiffs were damaged. The plaintiffs have failed to prove a claim for civil conspiracy.

■ To constitute a civil conspiracy there must be two or more persons, (for this purpose a corporation is a person), an object to be accomplished, a meeting of minds on the object or course of action, one or more unlawful overt acts, and damages. *More v. Johnson*, 193 Colo. 489, 568 P.2d 437 (1977); *Lockwood Grader Corp. v. Bockhaus*, 129 Colo. 339, 270 P.2d 193 (1954). The tort of conspiracy is an intentional tort that requires proof of a combination between two or more persons to accomplish an unlawful goal or a permitted goal unlawfully. *Morrison v. Goodspeed, supra.* There is only one defendant in this case, Robins, which for the purposes of the conspiracy claim is a single person. Robins' Chapstick division is not a separate person. The evidence does not support a finding that anyone at Robins intended injury to any of these plaintiffs and the evidence does not reveal any other entity, individual or corporate, with whom Robins may have conspired in its advertising, marketing and sale of the Dalkon Shield after it first purchased the Shield from the Dalkon Corporation in 1970. The claims of conspiracy are dismissed.

Causation is the core issue in these cases. It has been the question with which most of the expert witnesses struggled, both as to the individual plaintiffs, and on the more general question of population groups. Addressing this question, a distinction must be made between fact finding in the courts and in the scientific community. In the courts, cases are decided according to probabilities. Probabilities may, in turn, be based upon fair inferences from circumstantial evidence. It is not necessary to exclude all other possible explanations, or to avoid all apparent inconsistencies.

The first literature appearing in any medical journals on the possible association of IUDs with infections, particularly, mid-trimester septic abortion, was an article authored by Dr. Charles Christian, an OB/GYN in Tucson, Arizona, who was professor and head of the obstetrics and gynecology department at the University of Arizona. Dr. Christian had clinical familiarity with the Dalkon Shield because he had used it at the clinic in the University of Arizona Hospital. His article, which appeared in June, 1974, suggested the possibility of an association between IUDs and infections based upon his clinical observation of patients who were pregnant and had experienced spontaneous abortions which appeared to result from infection. He saw this as a new and different problem from the infection which often followed a criminally-induced abortion. Dr. Ellen Preston had visited with Dr. Christian in Tucson, and looked at his data earlier in 1974 before the article had been published.

There followed in the medical and scientific literature a number of papers dealing with the subject of the association between IUD use and pelvic inflammatory disease. At Robins' request, Dr. Brian Strom, a physician and epidemiologist, made a study of all of the available literature prior to the time of this trial. In his analysis, Dr. Strom used the scientific method and asked whether the articles showed a difference between the Dalkon Shield and other IUDs. He expressed a professional opinion that the studies did not show a statistically significant difference in the risk of contracting PID with a Dalkon Shield than with other IUDs. He reached the same conclusion with respect to the risk of septic abortion. Dr. Strom also concluded that these studies showed an increased risk of septic abortion and pelvic inflammatory disease with the use of an IUD. Indeed, he agreed that not only was there an association between PID and IUDs, the literature showed that all IUDs are a cause of PID.

Dr. Strom and other qualified experts who testified at the trial made the distinction between association and causation. In attempting to determine whether the association of two things can be considered to be cause and effect, it is appropriate to determine whether there is a plausible biological explanation for a causal relationship. In this case, the plaintiffs seek to show causation by hypothesizing that the tailstring of the Dalkon Shield permits the transport of bacteria from the vagina to the uterus by means of the ascension of fluids up through the filaments of the tailstring, and that such bacteria may then be released into the uterus through fissures and holes in the sheath. Such breaches of the integrity of the tailstring may be caused by breaks during assembly, by the stress of traction during removal and by deterioration in the body. That is a plausible theory because there is no doubt that the vagina always contains fluids which do harbor many kinds of flora and fauna which can be infectors. Additionally, it has been shown that cracks and holes do occur in the sheath and it has also been shown that fluids can move through the multifilament string, and are not always barred by the knot.

It must be remembered that Robins had problems with quality control from the foreign source of string supply and experienced difficulty in tying the string during assembly at Chapstick. Additionally, some clinicians had difficulty with removals because of the force required to pull the Shield through the cervix. Moreover, the defendant admits that all polymers, including Nylon 6, undergo changes in their mechanical and chemical properties after placement in the human body. There is no

doubt that the string becomes encrusted and it is plausible that a roughened tail-string surface can contribute to a significant increase in the bacterial population of the vagina by providing hospitable sites for colonization.

In late 1974, Robins requested a study of tailstrings of Shields removed from women. Dr. Judith Haber, a microbiologist, made tests at the Biskind Laboratory in Burlingame, California. She concluded that those used tails contained significant amounts of bacteria. The defendant has denigrated the results of the study because of methodological deficiencies but the protocol was established by Dr. Tankersley at Robins and there was no follow-up to improve or complete the study.

A second hypothesis is that the fins on the sides of the Shield traumatize the endometrium, creating lesions and ulcerations, permitting bacteria to colonize. Accordingly, when any bacteria enter the uterus, these areas are potential sites for colonization of the bacteria in sufficient numbers to produce infection and illness. Those fins also may traumatize the cervix during removal.

▮ It is to be emphasized that this court, as the trier-of-fact, is not to determine the issues in this case on the basis of scientific certainty, or even *scientific* probability. The burden of proof in this as in all other civil cases is by the preponderance of the evidence. The question, therefore, is whether all of the evidence in the case shows a greater probability that the Dalkon Shield caused the illness of the plaintiffs. That must, of course, be done on the basis of each individual plaintiff and the evidence pertaining to her. In making that analysis, however, it is appropriate to consider the more general question of whether the Dalkon Shield has a causal relationship with PID.

While it is not clear to this court that it is required of the plaintiffs that they establish that the Dalkon Shield creates a higher risk of PID than other IUDs, this court can and does find from the evidence in the case that there is a greater risk with this device than other IUDs for the very reason that it

was considered to be a more effective IUD—its unique design. The logic is that if all IUDs caused PID and if the Dalkon Shield is a more effective IUD, it should be a greater cause of PID if the reason for the causation of PID is related to the reason for the Shield's greater effectiveness. In my judgment, that is what is shown.

In my view of the evidence, the probabilities are that because of its different design and shape, the Dalkon Shield inside the uterus creates a greater inflammatory response than other IUDs. While that inflammation may be sterile, it does involve the body's defense mechanisms to a sufficient extent that, in a given woman, there may be a reduced resistance to an infecting invader, with the result that when the invasion occurs, the bacteria can grow in the uterus and then migrate through the lymphatic channels, through the blood, or through the tubes. It is also shown from the evidence that there is a probability that bacteria can enter the uterus through the process of the insertion itself, since that is done through the vagina, so that the Shield when first placed in the uterus can have the bacteria present. It can also occur through the ascension of fluids in the "wicking" process, with release through breaks in the sheath barrier and through other means. The expert opinion in this case is that the primary barrier to migration of bacteria from the vagina to the uterus is the cervical mucus. Both the quality and quantity of that mucus change with the menstrual cycle, and during the time of menstrual flow the effectiveness of the mucus is greatly reduced or even possibly eliminated. The barrier of the cervical mucus is penetrated by the string which bridges the uterine and vaginal cavities.

Proof of causation has also been presented at this trial through the testimony of qualified physicians relating their considered conclusions from their own clinical experiences observed in the light of medical literature. Here, again, there is, of course, considerable conflict with respect to the opinions expressed by the witnesses called by both plaintiffs and defendant. Yet, resolution of this conflict requires this court to

consider probabilities within the context of many unknowns. What is shown with overwhelming clarity in the evidence in this case is that medical science is, as yet, unable to provide answers with certainty. Medicine is an empirical science, and medical diagnoses are made by "ruling out" from known statistical possibilities where the signs and symptoms are inconsistent. The final result may be an uncertainty with treatment provided for the remaining possibilities. The tools of medicine are not precise and do not guarantee accuracy. The difficulties in culturing certain kinds of pathogens have been made very clear in this case, and the pathological tests are often done after the use of medications designed to destroy the bacterial invaders. We are then left with choosing among the conflicting opinions of expert witnesses and considering their testimony by the standards applicable to all witnesses.

In summary, if medical science is unable to tell us how and why an IUD prevents conception, it is not unexpected that medical science cannot tell us with certainty whether the Dalkon Shield produced a specific illness in a particular woman. Accordingly, the analysis of each of the plaintiffs' claims must be done on the basis of the evidence as it pertains to that person, within the general framework of the probabilities found here.

### JANETTE HAWKINSON JOHNSON

■ Janette Hawkinson Johnson was born December 16, 1953 and married Bob Hawkinson on May 13, 1972. Her contraceptive practices included the use of foam, the pill and a Lippes Loop. She had that IUD removed and became pregnant, giving birth to a normal female child on July 12, 1973. Six weeks later, Mrs. Hawkinson consulted Dr. Bryan Page in Tulsa, Oklahoma, who advised her that the Dalkon Shield was the best IUD available. The plaintiff had been told to avoid use of the pill because she had a tendency toward development of fibroid breast tumors.

Dr. Page inserted a standard size Dalkon Shield into Mrs. Hawkinson's uterus on August 23, 1973. The insertion was uneventful and Dr. Page told his patient to return in four weeks for a check on the IUD. Mrs. Hawkinson failed to keep that appointment.

The plaintiff wore the Dalkon Shield without difficulty. She became pregnant in March, 1974, and when that pregnancy was confirmed by Dr. Mulholland, a doctor who practices with Dr. Page, he advised that the pregnancy should be expected to carry to term with the IUD in place.

On the afternoon of May 30, 1974, Mrs. Hawkinson presented at a Tulsa hospital shortly after the sudden onset of vaginal bleeding without cramping. She was considered as a threatened spontaneous abortion case and was admitted to the hospital with conservative treatment, primarily total bed rest. The plaintiff was discharged on June 1.

Because of a fear of miscarriage and the requirements of taking care of her very young daughter, Mrs. Hawkinson elected to have a therapeutic abortion which was done by vacuum curettage on June 12, 1974 in Dallas, Texas. The Dalkon Shield was not removed by that procedure.

Thereafter, the plaintiff consulted with Dr. Jed Goldberg in Tulsa for removal of the IUD. On August 25, 1974, the Dalkon Shield was removed in a Tulsa hospital by Dr. Goldberg. He located the IUD at the back of the uterus in the lower uterine segment near the junction with the cervix. The Shield broke when grasped with forceps and, accordingly, it was necessary to remove the remainder with surgery, requiring two incisions into the uterus, one anterior and one posterior. The removal was difficult because the device was embedded in the myometrium. The patient was discharged from the hospital on September 1, 1974. While her post-operative medical course was normal, the plaintiff experienced considerable pain as a result of the operation and experienced marital difficulty resulting in a divorce. She moved to Colorado, divorced her first husband, remarried and again divorced. She had another pregnancy in February, 1981 which was terminated by an elective abortion in March, 1981. The plaintiff now uses the

surname Johnson and lives near Telluride, Colorado, an area which is remote from medical facilities suitable for a Cesarean section. That procedure will be required for the delivery of any additional children born to this woman because of the uterine scars.

There is sharply conflicting medical opinion on the issues relevant to this case. The defendant's witnesses contend that Dr. Page improperly inserted the Dalkon Shield and caused a perforation on insertion. It is also contended that this would have been discovered by examination of the string on the four weeks' check-up which did not occur because Mrs. Hawkinson failed to keep the appointment.

The contrary view is more persuasive. Dr. Page had two and a half years of experience with the Dalkon Shield at the time of the insertion in Mrs. Hawkinson. The reference to placement in the cervix in his medical notes is an apparent reference to insertion through the cervix. The length of the string as an indicator of a proper placement was available to him immediately after insertion, and there is nothing to suggest that he failed to note its length or that it was too long. Most significantly, this patient did not suffer any bleeding, pain or other discomfort while wearing the Shield, and it would be reasonable to expect that an immediate embedment into the myometrium would have produced some symptoms.

The Dalkon Shield was designed to be fundal seeking, and it was expected to migrate upward with uterine movements. The uterine wall thickens during pregnancy. Assuming low placement, it is probable that this device gradually embedded itself, providing less protection from pregnancy and then moved into the muscle tissue during the pregnancy which probably produced the bleeding which resulted in the hospitalization on May 30, 1974.

The unplanned pregnancy was, of course, a failure of the purpose of this IUD. Robins attributes that failure to improper placement. Assuming some fault attributable to Dr. Page, the defendant does not escape liability on that basis. The Dalkon Shield was misrepresented with respect to Robins' lack of knowledge concerning its safety and efficacy. It was not adequately tested, and each patient being inserted should have been told that she was using an essentially experimental device which should have been monitored carefully by a gynecologist. Clearly, Dr. Page was "sold" by Robins' marketing techniques and, unfortunately, he sold this patient to her great disadvantage. Dr. Page did not have the benefit of the advice that the Shield should be removed as soon as pregnancy was confirmed, which was to come in the May 8, 1974 "Dear Doctor" letter.

Based upon all of the evidence presented with respect to the product in general, and this plaintiff in particular, I find that Janette Hawkinson Johnson would never have used the Dalkon Shield if she and her doctor had been aware of the scant knowledge which Robins had of this product at the time it was marketed by the defendant, and if she and her doctor had also been aware of the information which was contained in the adverse reaction reports which Robins had received by August, 1973. The probabilities are that she would have utilized an effective contraceptive method which would have avoided the March, 1974 pregnancy, the hospitalization for the potential miscarriage and the therapeutic abortion in June, 1974. Certainly, she would not have undergone the surgical removal of the IUD and would not now have a scarred abdomen and a uterus which may present a threat of rupture in a future pregnancy. Janette Hawkinson Johnson has proved all of her claims for relief excepting fraudulent concealment, breach of express and implied warranties and civil conspiracy. She filed her complaint within the time provided by all relevant statutes of limitations.

The direct medical expenses for this plaintiff are $462. The pain and suffering and the limitations imposed upon this young woman with respect to future pregnancy requiring special prenatal care near the end of term as well as Cesarean section for delivery are elements of damages, and I find that the total damages in this case should be $125,000.

## RUTH A. WINCHESTER

Ruth A. Winchester was born on November 28, 1936 and married in May, 1957. She gave birth to two healthy children, the first born on April 27, 1958, and the second on June 20, 1959. Mrs. Winchester experienced many vaginal and lower genital tract infections during the years 1964 to 1973. She used the pill for eight years, but was cautioned against further use of it because of hypertension. Accordingly, on June 5, 1973, she was inserted with an IUD by an Air Force doctor. Mrs. Winchester was unaware that the doctor's choice was a Dalkon Shield.

On April 30, 1978, she presented to a hospital emergency room with acute abdominal pain and a temperature of 100.8 degrees. She was admitted to the hospital with a diagnosis of an infection with tubo-ovarian abscess and she was treated with massive doses of antibiotics. The Dalkon Shield was removed during this hospitalization on May 2, 1978. Mrs. Winchester was released after eight days of hospitalization and she was able to return to work on July 16, 1978. Apparently, removal was accomplished by traction on the tailstring.

While she was first seen by Dr. Blake on April 30, 1978, the treating physician during the hospitalization was Dr. Cohen who used intravenous penicillin and chloromycetin. He used those drugs because he considered her condition to be life-threatening. There is a wage loss of $1,441.87 for this hospitalization and convalescence. Mrs. Winchester continued to have some abdominal pain and painful sexual intercourse.

Ruth Winchester saw Dr. Baker on October 2, 1979.

Dr. Baker's notes show that he examined this woman on that day and found a bloated abdomen and tender pelvic organs, with thickening present in the right adnexal area. Dr. Baker told Mrs. Winchester that most patients with recurrent symptoms of such severity require a hysterectomy, and he gave her antibiotic treatment. There has been no recurrence of PID symptoms since that date. She does experience "shooting pains" at times and sometimes has pain during sexual intercourse.

The diagnosis of PID is a critical issue in this case. The defendant's expert witnesses observed that such a diagnosis can be made with certainty only by examining the abdomen with a laparoscope. The diagnosis of Mrs. Winchester was made solely on clinical and laboratory findings of lower quadrant tenderness, a fever of 101 degrees, an elevated white blood count with a shift to the left, and a thickening of the right adnexa. The differential diagnosis offered by a defense witness, Dr. Dafoe, was endometriosis and a ruptured cyst.

This would appear to be a case of long-term benign use of the Dalkon Shield with a sudden outbreak of acute PID. That would seem to be consistent with the pattern experienced by other women in these cases and in the literature. It is the sudden onset of PID which seems significant. While the defendant makes much of the earlier lower genital tract infections, I am persuaded that the PID is unrelated to them and it should be noted that she did not experience the symptoms of those infections after 1974.

In Mrs. Winchester's case, the defendant also attempts to rely on the Colorado Product Liability Act, C.R.S. §§ 13–21–401 through 406, asserting that her device was not removed until May 2, 1978, which was when she first contracted PID according to her claim. At that time, the product had been off the market for almost four years and the warning section of the October, 1973 physician file card and package insert showed severe sepsis as an adverse reaction. Additionally, the May, 1974 "Dear Doctor" letter recommended removal of the device upon a diagnosis of pregnancy. This argument, however, fails because there was no warning of association with sepsis in non-pregnant women, and there was no "Dear Doctor" letter warning of the association with PID or recommending removal of the device from a woman who is not experiencing symptoms.

What probably happened to Ruth Winchester is much like what Robins finally

recognized in the "Dear Doctor" letter of September 25, 1980. Additionally, the trauma of the removal probably exacerbated the infection.

Ruth Winchester has proven all of her claims for relief excepting fraudulent concealment, breach of express and implied warranties and civil conspiracy. The presumptions arising out of the Colorado Product Liability Act have been rebutted and the complaint was filed timely.

The evidence in this case does not support a finding that Ruth Winchester is likely to require a hysterectomy or will probably suffer future injury from the use of the Dalkon Shield. She has refused to undergo further exploration to determine the extent of the effects of the episode of PID in 1978. Accordingly, her damages are limited to the pain, suffering and expense sustained before, during and immediately after her hospitalization and during the period of six weeks' convalescence. A reasonable award of compensatory damages for her injuries is $75,000.

### JO SUSAN VERSPOHL

This plaintiff was born March 16, 1940, and married in 1966. She gave birth to normal children on February 25, 1968 and December 16, 1970. The obstetrician who cared for her during these two pregnancies and deliveries was Dr. David Plotkin in Long Island, New York. On a postpartum visit on January 21, 1971, contraceptive methods were discussed. She had previous experience with the diaphragm and foam and had taken the pill for relief of cramps. She found the diaphragm and foam to be unsatisfactory and was concerned about weight gain with the pill. Dr. Plotkin told her that his wife used a Dalkon Shield and it was the best. Mrs. Verspohl relied on that advice.

A multiparous Shield was inserted on March 4, 1971, but because Mrs. Verspohl experienced cramping, that Shield was replaced with a nulliparous size on June 8, 1971. On August 2, 1971, Dr. Plotkin performed a pelvic examination and found that the IUD was in position.

After missing her menstrual periods in November and December, 1972, Mrs. Verspohl consulted Dr. Williams in Denver and he confirmed her pregnancy with the Dalkon Shield in place. Because the tailstring was not then visible, the Shield could not be removed. Dr. Williams told the plaintiff that she could carry the fetus with the Shield and it would come out with the afterbirth. Mrs. Verspohl was concerned that the IUD might affect the baby and there was some discussion of abortion which was not then legal in Colorado.

The pregnancy followed a normal course until late March, 1973. On March 26, 1973, she went to Dr. Henry complaining of uterine contractions. Upon pelvic examination, Dr. Henry noted a closed cervix and an absence of discharge. Her temperature then was normal. On March 27, she felt ill with spotting and cramps. She called Dr. Williams who told her to go to the hospital. Mrs. Verspohl went to St. Luke's Hospital where she was admitted at 1:15 a.m. on March 28, with a fever of 100.6° F., potential labor pains and a bloody show.

She was seen by Dr. Hardy and given a form of antibiotics, and at 5:51 a.m. she delivered a premature male fetus which did not respirate spontaneously and died shortly after birth. The placenta was removed manually and the pathology report on the contents of the uterus and the IUD reflected the presence of non-hemolytic streptococci, staphylococcus epidermis and bacteroides. The temperature elevation of Mrs. Verspohl remained at 100.6° F. at 8:15 a.m. and 10:15 a.m. on March 28th. Her temperature fell to 98.0° F. by 4:00 p.m. on March 28 and ranged between 97° F. and 98° F. during the remaining two days of her hospitalization.

Six months later, Mrs. Verspohl again became pregnant and without complications delivered a healthy child on June 1, 1974. After the birth of this third child, she elected to have a tubal ligation as a means of permanent sterilization. At present, the plaintiff has excellent physical health. She testified that she still has guilt feelings about the loss of the baby boy.

She also testified that for about three years after that loss, she had painful intercourse at times, but she has no problem with that now.

A critical factual issue in this case is whether this fetal loss occurred after infection and therefore could be considered a midtrimester septic abortion, or whether the evidence of infection found in the pathology report was introduced into the uterus through the procedure for the manual extraction of the placenta, which requires reaching through the birth canal. The type of pathogens found in the pathology report are common residents of the vagina.

The positive indicators for an infected pregnancy loss include the elevated temperature and some flu symptoms which the plaintiff experienced shortly before her admission to St. Luke's Hospital. The plaintiff was hospitalized for three days and she regained her strength and was able to return to normal daily activities five days after discharge from the hospital.

The negative factors include the lack of a sufficiently elevated white count, the quick reduction in temperature with a relatively light dose of penicillin, the lack of some flu symptoms and the lack of evidence of intrauterine fetal demise. In this case, the probability is that Jo Susan Verspohl did not suffer a fetal loss as a result of infection and that there was no involvement of the Dalkon Shield in that incident. The fact that she became pregnant with the Dalkon Shield is not, in itself, a basis for damages in this case. This court cannot determine that this pregnancy was not within the range of risk which Robins represented and which this plaintiff accepted.

Accordingly, in this case, the judgment is for the defendant on a failure of proof of causation on any of the plaintiff's claims for relief.

## ELLA LEE FORD

This woman was born in October of 1946 and was married in 1964 at the age of 17. She used the pill until 1969 when she and her husband decided to have their first child. After the birth of that baby she used the Lippes Loop until 1971 when she removed it to get pregnant and she had another normal healthy child delivered in 1972. In a postpartum visit to Dr. Rodney Moore in Dallas, Texas, Mrs. Ford asked for another Loop, but Dr. Moore recommended the Dalkon Shield as a better device. He inserted her with a Dalkon Shield on April 21, 1972. The plaintiff recalls that she saw the Dalkon Shield, that she was menstruating when it was inserted and that she remembered reading a pamphlet in the doctor's office.

Mrs. Ford then moved to Colorado Springs in June, 1972 and went to Dr. Short in May, 1973 for a routine annual check-up and a normal pelvic examination. In May, 1974, Mrs. Ford had her first vaginal infection with itching, burning and a discharge. Dr. Short treated that with a suppository which provided improvement.

She returned to Dr. Short on June 4, 1974, complaining of tenderness and soreness in her lower abdomen. On June 11, 1974, Mrs. Ford was admitted to the Penrose Hospital where she was treated with bedrest and pain medication. The doctor examined her and observed a discharge from the cervix, the cervix was tender and there were tender adnexa, but no masses were found. His opinion was that she was suffering from salpingitis. The patient was discharged as improved on June 14, 1974.

On June 19, 1974, during an office visit to Dr. Short, Mrs. Ford continued to complain of abdominal pain and the Dalkon Shield was removed without antibiotics. Five days later, on June 24, 1974, Mrs. Ford returned to Dr. Short's office and reported that she was feeling better, had less pain and was bleeding heavily.

On July 2, 1974, Mrs. Ford made an office visit to Dr. Greiner, a partner of Dr. Short. At that time, she reported vaginal discharge, itching and burning, pain and said that she tired easily. A yeast culture was taken with negative results. The doctor found the cervix, uterus and adnexa all tender, and he prescribed broad spectrum antibiotics.

On July 15, 1974, the plaintiff saw Dr. Short on an office visit, complaining of recurrent discharge and pain. Dr. Short did a pelvic examination and found that the uterus, tubes and ovaries were "exquisitely tender," but there were no masses. He gave a broader spectrum antibiotic medication and formed the opinion that she was suffering from chronic PID and the doctor began to consider surgery.

The next office visit with Dr. Short was on July 24, 1974 and the patient had less pain, but still had vaginal discharge and felt poorly overall. Again, the cervix, uterus and tubes were tender and the doctor recommended a laparotomy. Admission to the Penrose Hospital for that purpose was on July 30, 1974. Dr. Short's admitting diagnosis was chronic pelvic inflammatory disease. The laparotomy was performed by Dr. Short and Dr. Maxwell. The hospital records reflect that they reported seeing shaggy adhesions over the uterine surface, fundus, adnexa, and appendix. They both concluded that this represented chronic pelvic inflammatory disease and that a total abdominal hysterectomy was indicated. They proceeded with that surgery and, accordingly, there was a total abdominal hysterectomy, bilateral salpingo-oophorectomy and incidental appendectomy done. Mrs. Ford recovered well from the surgery and was discharged on August 6, 1974. Hormone therapy has been prescribed for her until she reaches age 50, and Dr. Short also suggested that she consult a psychiatrist for depression, but he gave her some medication because she complained of nervous rashes and difficulty sleeping.

The defendant disputes the diagnosis of PID and presented witnesses suggesting the correct diagnosis would be pelvic congestion, or psychosocial pelvic pain. Dr. Downing gave that opinion and in excluding PID, relied principally upon the pathology report which he said did not show any evidence of a disease process. He also noted that she had complained of pain with intercourse, a diagnostic criterion for pelvic congestion. Dr. Kirschbaum and Dr. McQuarrie also disagreed with the PID diagnosis. Dr. Favara noted that there were some white cells found in the pathology report, but he said that this finding was consistent with the inflammatory response generated by the IUD. That opinion is suspect because the IUD had been removed 45 days earlier and there had been several courses of antibiotic medication after removal.

Dr. Kopelman agreed with the PID diagnosis and also opined that it was causally related to the removal of the Dalkon Shield on June 19th. Dr. Downing admitted that if this was a case of pelvic congestion, the operator's report should show an observation of widely dilated veins around the uterus, and there is no such note in the operator's report. Additionally, rapid onset is not typical of pelvic congestion, and it does not produce adhesions.

The pivotal issue here, perhaps, is whether there were sufficient adhesions to be indicative of PID. I am persuaded by the testimony of Dr. Short and the hospital operative report of Dr. Short and of Dr. Maxwell. The probabilities are that Ella Lee Ford had PID as a result of the Dalkon Shield.

Mrs. Ford has proven all of her claims for relief except for fraudulent concealment, breach of express and implied warranties and civil conspiracy.

With respect to damages this is a total castration case. Because there is an indication that this woman spoke to her doctor about voluntary sterilization, the loss of opportunity for further children is not very significant here. Yet, there are other consequences of this sterilization. Mrs. Ford has had difficulty with depression both before and after this surgery. The evidence is persuasive that her mental and emotional condition was aggravated by the surgery. Both depression and anger are involved. She suffered substantial loss of feminine identity when she was only 27 years old. These are proper elements of damages. She continues to receive therapy from an internist. An appropriate award of compensatory damages in this case is $300,000.

## LINDA PARKS–MORROW

This plaintiff was born June 10, 1952. She was married in 1971 and had her first

child on January 13, 1972. A second child was born February 20, 1973. She and her husband decided then to limit their family for financial reasons and, on May 18, 1973, she was inserted with a Dalkon Shield, after exploring the possibilities of other kinds of contraception. Mrs. Parks was a trained practical nurse and she was aware of the experience of a friend who had another type of IUD and suffered perforation of the bowel and peritonitis during pregnancy. The plaintiff said that she read the Shield labeling and understood that it had about a 1% pregnancy rate. Dr. Kassman, the inserting doctor, told her that the Shield was the most effective and the safest IUD on the market at the time. She and her husband then lived in Ithaca, New York.

Linda Parks wore the Dalkon Shield without any problems from May, 1973 to March, 1975. In January, 1975, she had her first vaginal infection, apparently trichomonas, which was unrelated to the Shield.

In the summer of 1975, after moving to Seattle, Washington, the plaintiff began to experience some tenderness, an increased flow and cramps. She also experienced bleeding after intercourse and some bleeding between periods. She went to the Planned Parenthood Clinic in Seattle where the Dalkon Shield was removed, without antibiotics, on August 5, 1975. The plaintiff testified that she saw some tissue adhering to the "feet" of the device when it was showed to her after removal.

Mrs. Parks separated from her husband and moved to Phoenix, Arizona where she was admitted to the Maricopa County General Hospital on October 6, 1975, with abdominal pains which were thought to be possible appendicitis. More specifically, she had right-sided abdominal pain and a fever of 100.4° F. After nine days of hospitalization without improvement, an exploratory laparotomy was performed by a general surgeon. During that surgery, the doctor found adhesions and concluded that there was bilateral salpingitis. The patient was then transferred to GYN service, where she was treated conservatively with antibiotics and discharged on October 23,

1975. Antibiotics were continued after discharge.

The defendant does not dispute that the diagnosis of PID at this hospitalization was correct. It claims, however, that the findings were diagnostic of Fitz-Hugh-Curtis Syndrome. The common pathogens associated with this syndrome are gonoccocus and chlamydia, both sexually transmitted organisms. In this regard, the defendant makes much of the fact that the plaintiff testified that from May to August, 1975, she had two sex partners in addition to her husband. It is to be noted that a test for gonococcus was negative in the hospital. The defendant contends, however, that such tests are difficult and there was no test for chlamydia. The pathology report on the appendix, which was removed during the exploratory surgery, showed the presence of pinworms.

Robins is critical of the medical treatment given to this patient, including the failure to cover the Dalkon Shield removal with antibiotics. The plaintiff correctly notes that at no time did the Robins Company advise physicians to take that precaution. Robins also is critical of the delay in diagnosing and treating the PID with antibiotics in Arizona. The first seven or eight days of hospitalization did not include any antibiotic therapy. It is to be noted here that the physicians were working with a possible diagnosis of appendicitis. They were not made aware of the Dalkon Shield removal because the plaintiff had no reason to believe that her condition was related to its removal. At that time, the medical literature was insufficient to cause an inquiry by the physicians in that regard.

In 1976, the plaintiff's separation from her husband ended with a divorce and she began living with Doug Morrow. They had a ceremonial marriage in January, 1981. Before that marriage, they engaged in unprotected intercourse to become pregnant without success.

Disturbed by her apparent infertility, this young woman sought assistance, and in September, 1979, she underwent a laparoscopy with insufflation of dye to deter-

mine the extent of tubal obstruction. That procedure required two days of hospitalization.

Dr. Gottesfeld, a specialist in tubal reconstruction surgery, performed a procedure on this plaintiff in November, 1979, requiring nine days of hospitalization. The left tube and right tube were both shortened in that surgery. In January, 1980, a hysterosalpingogram was performed, showing some filling and spilling from the right tube and partial spilling of the left tube. On September 13, 1980, a laparoscopy performed by Dr. Gottesfeld showed adhesions around both tubes, no spillage from the left tube and some spill from the right tube. On October 30, 1980, the plaintiff was hospitalized for a laparotomy with removal of adhesions from both tubes and insufflation of the tubes was unsuccessful. That hospitalization was for one week. On December 29, 1980, another hysterosalpingogram reflected no spill from either tube.

The evidence is convincing that the plaintiff is sterile. The defendant asserts that even if liability is shown in this case, the "heroic" efforts to regain fertility are unreasonable and therefore not a proper subject for compensatory damages. I disagree. This is a woman who sincerely desires more children; she went to a specialist to obtain relief from her infertility, and there is nothing to indicate that he took advantage of her by performing procedures which were not medically indicated. Quite the contrary, one may be confident that if these efforts had not been made, the defendant would be challenging the claim of infertility.

Causation is the core dispute in this case. The defendant contends that there is no implication of the Dalkon Shield. It suggests that because of signs of PID when the Shield was removed, antibiotic therapy should have begun at that time. That is inconsistent with the position taken in other cases where the defendant asserts that a diagnosis of PID requires clinical findings which were not present when the plaintiff presented herself at the Planned Parenthood Clinic in Seattle. There is an indication that the plaintiff was suffering from endometritis prior to the removal of the

Shield in August, 1975. That condition can result from the Dalkon Shield producing a greater inflammatory response than other IUDs and the influence of an infecting agent using the tailstring as a pathway. The removal of the Shield, causing greater tissue trauma, aggravated the infection and produced the acute symptoms which required the surgery in Maricopa County General Hospital in October.

The defendant makes a rather puzzling moralistic defense in this case, asserting that the plaintiff's PID is the result of engaging in sexual intercourse with several partners who may have had multiple sexual encounters with others. Most particularly, the defendant suggests that chlamydia is the pathogen responsible for her infection. It is noted that Mr. Morrow had a 1974 gonococcal infection, which was treated and presumably cured before his contact with the plaintiff. Yet, the defendant asserts that chlamydia often is transmitted with gonococcus and that chlamydia can remain in a person asymptomatically for a long time. This is speculative. The only pathology report showing an infecting organism in this woman at the time of her surgery in August, 1975, describes it as anaerobic gram positive bacilli-diptheroid-like. Such bacteria is one of the normal vaginal flora. It is not descriptive of either gonococcus or chlamydia.

Indeed, the Dalkon Shield was not designed for use by persons who are not sexually active. Its very purpose is to prevent conception while permitting the user to engage in sexual intercourse with spontaneity and without the preparations necessary for other kinds of contraceptive methods. Robins did not restrict the sale of its device to monogamous persons. The safety of the product must, therefore, be considered in a climate of sexual activity, including multiple partners. As is apparent from the medical literature, there is an increased risk of PID associated with all IUDs, and, an increased risk of PID also follows multiple sexual partners. The risks are multiplied when these two factors are associated together and enhanced further when the IUD is a Dalkon Shield.

It is also to be noted in this case that Dr. Starley testified that in his opinion all IUDs are associated with low-grade endometritis. This woman's medical history illustrates the probability that the very features which were so highly touted for the Dalkon Shield—its resistance to expulsion and greater effectiveness because of an increased area of contact with the endometrium—cause this device to be associated with more endometritis than such devices as the Loop and Coil.

Another aspect of this particular case that needs discussion is the contention that infertility results from the presence of granulomas tissue in the tubes. The defendant asserts that such tissue comes from pinworms or from the talc on surgeon's gloves. It could well be the latter, but the surgery which caused the physicians to enter the abdominal cavity and introduce talc into it is the surgery resulting from the symptoms which were thought to be diagnostic of appendicitis, but which were actually reflecting the PID caused by the Dalkon Shield.

If this woman did suffer from Fitz-Hugh-Curtis syndrome, it was probably caused by the same pathogen which produced the salpingitis which was aggravated or enhanced by the presence of the Dalkon Shield. Even if it is assumed that she was infected by chlamydia, her sexual activity was influenced by the fact that she thought she was protected by a safe and effective device and that device enhanced the effects of the infecting agent.

This plaintiff has proven all of her claims for relief excepting fraudulent concealment, breach of express and implied warranties and civil conspiracy.

Linda Parks-Morrow sustained a wage loss of $7,000 and she has spent approximately $8,000 in her quest for fertility. She has endured the pain and suffering of five surgeries and three hysterosalpingograms, all requiring hospitalizations. Her only chance for bearing a child is by in vitro fertilization if that process ever is made available to her. A reasonable award of compensatory damages for this woman is $375,000.

## MARY JAYNE CATTO

She was born May 18, 1944, and married July 21, 1967. This marriage continues. She had her first child on August 6, 1969 and a second child May 18, 1972. She had used the pill and foam. Because the second child was born with a heart defect and the parents were concerned about abnormalities in future children, they talked with the attending physician, Dr. McCreedy, about effective contraceptive methods, and he recommended the Dalkon Shield because it was more effective than the Pill. He advised her that she might have heavier menstrual bleeding and cramping. The Shield was inserted June 23, 1972.

Mrs. Catto had heavier bleeding, longer periods and shorter intervals between periods while wearing the IUD, but she thought these were normal effects. By April 6, 1973, her discomfort had been such that she asked for removal, and Dr. McCreedy did remove the Shield on April 6, 1973.

A few days later, on April 15, 1973, she presented at the emergency room at Lutheran Hospital with right lower quadrant pain, some fever, discharge from the cervix and the tubes were tender. Dr. McCreedy made a diagnosis of pelvic inflammatory disease and prescribed antibiotics.

The plaintiff's discomfort continued and she and her husband elected tubal ligation for sterilization. That was performed by Dr. McCreedy on April 7, 1975. During the procedure, Dr. McCreedy noted multiple adhesions of both fallopian tubes to the areas of the ovaries; the left fallopian tube dilated as one would expect with a hydrosalpinx, and the right fallopian tube appeared plugged and closed. The doctor's post-operative diagnosis was "chronic pelvic inflammatory disease with numerous tuboovarian adhesions and a small hydrosalpinx of the distal portion of the left fallopian tube."

While the plaintiff testified that she had problems during the next four years, she did not seek gynecological treatment during that time. She explained that she had numerous other problems, including open

heart surgery for her son, and she simply did not have time to attend to her own health. At any rate, she had some bleeding and Dr. McCreedy performed an office dilation and currettage on September 18, 1979. After that procedure, the plaintiff had pain, low-grade fever and a tender uterus. She was given antibiotic therapy but continued to have these symptoms during the next months. On December 31, 1979, Dr. McCreedy suggested a total hysterectomy, and advised her to get a second opinion. Mrs. Catto went to Dr. Shields for that purpose on January 15, 1980. From the plaintiff's history, Dr. Shields thought that this was a case of recurrent PID. On his pelvic examination, Dr. Shields found the uterus was slightly enlarged, slightly tender, but there were no adnexal masses and he noted that she "really does not have clinical evidence of PID." He then noted that the patient indicated that when she goes off antibiotic therapy she gets recurrent fever and chills and has to go back on antibiotics. Dr. Shields agreed that the hysterectomy should be performed and a decision about the ovaries would be made during the surgery. Dr. McCreedy performed a total hysterectomy on January 18, 1980.

The plaintiff contends in this case that her PID was caused by the Dalkon Shield with the first clinical signs occurring a few days after the removal. She testified that she had had some abdominal pain earlier while she was on a trip to Texas. The plaintiff asserts that she experienced smoldering PID which was flared by the D & C, and that the hysterectomy therefore was caused by the Dalkon Shield. She also claims that she has post-hysterectomy syndrome, feeling a loss of femininity from the absence of her pelvic organs, and that she is reminded of her condition when she takes hormone therapy.

While the pattern in this case is consistent with the other removal cases, there is some difficulty with the four-year interval. Dr. Kopelman thought that the symptoms suggestive of PID on April 15, 1973 were directly related to trauma to the uterus and cervix caused by removal of the Dalkon Shield. He noted that the removal was not covered by antibiotics and that he had himself adopted the procedure of covering removal with antibiotics based on his experience with one disaster case and some others showing a pattern of sudden development of PID shortly after removal. He noted, however, that that was not the general practice of physicians during 1972, and did not begin until 1973. Dr. Kopelman thought that the Dalkon Shield was directly related to PID after removal and that this woman's symptoms never really disappeared. He expressed the opinion that it was common for PID to "smolder" for years. He also said that while there was an infection risk with the D & C, the results of the hysterectomy showed chronic infection.

The defendant didn't really rebut this opinion, it only expressed the implausibility of such a long delay. The expert witness relied upon by the defendant is Dr. Kirschbaum. He said that there was no sign of PID at the time of the D & C, and that the pathologist's report after the curettage does not show any infection. There was only an inflammatory infiltrate reported, which would be endometritis. He also disagreed with the laparotomy, but it is not clear on what basis. Finally, he stressed that the pathology reports after the hysterectomy did not show disease in the tubes and ovaries. He also thought that if there had been infection when the tubal ligation was done in April of 1975, there would have been a febrile post-operative course and that didn't happen. Finally, too, he said that fever and chills are essential to a diagnosis of PID and that while the patient says she had them, this is not supported in the medical record itself. The testimony of Dr. Kirschbaum was based on his analysis of the medical records.

Dr. Kirschbaum's opinions were directly contradicted by the opinions of Dr. Kopelman who also relied on the medical records. On balance, Dr. Kopelman was the more persuasive witness in this woman's case. His opinion was that Mrs. Catto's PID resulted from the removal of the Shield and that she was never free from the infection

until the hysterectomy. Dr. Kopelman believed what Dr. McCreedy wrote in the medical records and Dr. Kirschbaum did not give credence to that part of those records.

Dr. McCreedy testified at the trial and that testimony fully supports the claim. The D & C which was required did flare the infection into the symptoms for which the hysterectomy was appropriate treatment, and the Shield was a continuing cause of the infection and its consequences.

 Mrs. Catto first was diagnosed to have pelvic inflammatory disease immediately after removal of her Dalkon Shield in 1973. She had surgery to perform a tubal ligation on April 7, 1975. At that time, her physician, Dr. McCreedy noted multiple adhesions of both fallopian tubes in the area of the ovaries and diagnosed chronic pelvic inflammatory disease. Dr. McCreedy did not conclude that there was a causal relationship between the PID and the Shield until the hysterectomy performed in January, 1980. Accordingly, her warranty claims are not barred by the statute of limitations.

While Dr. McCreedy did tell Mrs. Catto that the Dalkon Shield was more effective than the Pill, the testimony does not establish that he made express statements about the Shield's safety sufficient to create an express warranty of safety. Nor does the testimony show that Mrs. Catto chose the Shield because of a reliance on any other express representations as to safety.

She did, however, rely on an expectancy that a reputable pharmaceutical company and a trusted physician would not provide her with a contraceptive product which was not safe as well as effective. In the packaging material and through other marketing methods, Robins had, by June 23, 1972, the date of Mrs. Catto's first use of the Shield, given the medical profession, including Dr. McCreedy, a representation that the Dalkon Shield was fit and suitable for use as a safe and effective contraceptive by all women. Mrs. Catto used the product in reliance on her doctor's advice in attempting to accomplish her purpose of obtaining safe and effective contraception. The de-

fendant breached the implied warranty of fitness for that purpose. Mrs. Catto has proven all of her claims for relief excepting fraudulent concealment and civil conspiracy. Mrs. Catto has lost $1,490 in wages and sustained medical expenses of $1,661. She is a castrated woman with an emotional loss. Her damages are fixed at $200,-000.

### XENIA GRAVES

Xenia Graves was born on March 1, 1949, and was married September 10, 1966. While using the pill for contraception she became pregnant and delivered a 4 pound, 9 ounce baby girl five weeks prematurely. The plaintiff returned to use of the pill for the next 3 years and then switched to foam.

In June, 1971, Mrs. Graves requested a Dalkon Shield which was inserted by Dr. Sun at the Planned Parenthood Clinic in Denver. Mrs. Graves particularly requested the Dalkon Shield on the recommendation of a friend who told her that it was the best IUD. The plaintiff remembers Dr. Sun telling her that the pregnancy rate was from 3 to 5% and that if she became pregnant she would probably miscarry.

The plaintiff did become pregnant in January, 1972. She had been taking diet pills, diuretics and amphetamines, to combat her continuing problem with overweight. She is 5'8" tall and was weighing from 180 to 200 pounds.

When she was aware of an early sign of pregnancy, morning sickness, she could not find the string on the Dalkon Shield. She had been checking the string in the early months, but had not done so since October of 1971. After some pregnancy tests at Planned Parenthood, Mrs. Graves went to Dr. Richard Harvey on March 1, 1972 for prenatal care. Dr. Harvey was told about the Dalkon Shield, but he could not find the tailstring.

On June 12, 1972, Xenia Graves was examined in Dr. Harvey's office. She had felt labor pains, but Dr. Harvey thought these were cramps. Dr. Harvey noted some blood in the urine. He had been

treating her with Gantanol, a sulpha-type drug, for a urinary tract infection for two days. After the examination, Mrs. Graves went home, but then at 7:30 p.m. that evening she presented at the hospital with labor pains and the cervix fully dilated. She delivered a premature infant at 7:44 p.m. The baby weighed 1 lb., 1 oz., and died within four hours. The baby was thought to be of 22 to 24 weeks gestation. The exact time of gestation was difficult to determine because it was hard to feel this patient's uterus because of her obesity. The Dalkon Shield was expelled with the placenta. The hospital temperature and pulse rate charts are confusing, but it would appear that she may have had a temperature of 99° F. at the time of admission and that she had a temperature of 101° F. at 24 hours after the delivery. She did not feel sick when she went to the hospital. There were no flu-like symptoms.

The pathology report on the placenta and umbilical cord indicated acute inflammation and signs of an ascending infection which are often seen in premature delivery cases without any association with an IUD. The plaintiff was discharged from the hospital after 3 days and is now in good health. She was divorced from her husband for causes unrelated to this case in May, 1979.

Counsel have argued this case on the basis of whether Mrs. Graves experienced a septic abortion. Dr. Mishell thought it was. Dr. Harvey felt that the pathologist's report reflected infection on the maternal side. This plaintiff's signs and symptoms do not fit the pattern for septic abortion which Dr. Mishell and the plaintiffs' counsel assert in all of these cases. Particularly, the absence of flu symptoms makes this case different. Mrs. Graves' signs and symptoms did not fit the criteria for septic abortion used in the Women's Health Study.

The defendant asserts several possibilities to increase the risk of the pregnancy loss in this case. These include the facts that the plaintiff was overweight, had some hypertension and was taking diet pills. Also, there were Rh positive and Rh negative differences which could have generated an immune problem here, but no doctor testified that that was anything significant. Likewise, the plaintiff's husband has Marfan's Syndrome, but that, too, is not considered significant medically.

Dr. Christian expressed his opinion that this was a septic abortion because of the temperature elevation and the signs of amnionitis seen in the pathologist's report. Dr. Harvey shared that view although his testimony was inconsistent with the final case summary which he wrote when discharging this patient from the hospital on June 15, 1972.

I am persuaded primarily by the testimony of the defendant's witness, Dr. Favara, who, in analyzing the pathology reports and the slides, indicated that he did not think this was a septic abortion. Dr. Favara has demonstrated greater expertise in the interpretation of pathology reports than Dr. Christian and Dr. Harvey. Mrs. Graves had a number of risk factors for fetal loss. On balance, it is more probable that she experienced a premature delivery for reasons which were not related to the Dalkon Shield. Accordingly, causation has not been proven in this case.

There is no separate basis for recovery for pregnancy in this case. This pregnancy is within the known risks which she undertook, and it is noted that this woman also became pregnant with the pill.

Judgment will enter for the defendant on the claim of Xenia Graves.

### DIANE WHITNEY

Diane Whitney was born October 25, 1951 and she has never married. This woman has been sexually active since age 17. In 1972, while she was in college in Florida, she became pregnant and had an elective abortion by D & C in New York City at an unknown clinic. She was inserted with a Dalkon Shield in that clinic on the same day as the D & C. She had become pregnant when she stopped taking the pill because she was concerned about side effects.

In 1973, Ms. Whitney had a urinary tract infection which was cleared after about 4 days of treatment.

Diane Whitney checked the tailstring on her IUD regularly and seemed to wear the device without difficulty. In January, 1977, she went to the University of Southern Florida Student Health Service because of some low abdominal pains, and she told the attending physician that she had a Dalkon Shield. He said that that was no problem and that she could continue to wear it. Ms. Whitney concluded that her pain was caused by exercises, particularly Yoga. She had no additional difficulties and moved to Colorado in May, 1978, when she started a bicycle shop in Maintou Springs, and then changed to real estate work with her brother.

In the early part of 1980, this plaintiff began to notice that her periods were longer and on April 10, 1980, she went to the Women's Health Services Clinic in Colorado Springs for a pap smear. In July, 1980, she got a letter advising that she had a Class II pap smear result and some medication was suggested. She ignored that letter and went on a trip.

On July 24, 1980, she saw Dr. Robert Hahn, complaining of tenderness. During a pelvic examination, Dr. Hahn noticed an apparent mass on the right side. He removed the Dalkon Shield, without great difficulty, and prescribed Tetracycline.

Despite the use of antibiotics, Ms. Whitney did not improve and Dr. Hahn hospitalized her in Memorial Hospital in Colorado Springs on July 30, 1980. An ultrasound was done and it revealed the mass on the right. On August 6, 1980, Dr. Hahn did exploratory surgery and found free pus in the peritoneal cavity. The left fallopian tube was slightly dilated and adhered to the left ovary which appeared normal, except for some adhesions. The right adnexa and uterus were totally involved in an infected mass and because of the chronic pelvic inflammatory disease present, a complete hysterectomy was performed, with the exception of leaving the left ovary in place. The patient was discharged on August 10, 1980, and has had a normal post-operative recovery. She testified that she has depression at times and some ovulatory pain. She also has a scar on the lower abdomen.

There is no question that this woman did sustain chronic pelvic inflammatory disease. In all probability the removal of the Shield exacerbated the PID, even though antibiotics were given.

The defendant in this case again contends that the sudden severe infection is an onset which is consistent with a gonococcal infection or another virulent sexually transmitted organism. The defendant relies on indications that the chronic inflammation was most apparent in the endocervix and that there is no dispute that there was an ascending infection from the lower to the upper genital tract. The defense theory is that when there has been a benign course for so long and a sudden onset of infection, there must have been an infecting organism transmitted into her shortly before the infection.

There is no persuasive evidence that Diane Whitney had a gonoccocal infection.

The defense relies on the Colorado Product Liability Act in this case. That statute became effective July 1, 1977, and, it is urged, entitles Robins to the presumptions under the Act and also the period of repose arising from conformity with the state of the art. As indicated in the earlier general discussion of this statute, it provides only a presumption of a non-defective product. That presumption has been overcome by the plaintiff's evidence and causation has been sufficiently established for recovery.

The fact that this woman wore the Dalkon Shield for eight years before being overwhelmed by infection indicates that her general health and physical condition were excellent and she was able to resist the effects of the low-grade infection which had been developing and smoldering. It helps to explain why so relatively few women developed PID compared with the number exposed to it as an increased risk from use of this IUD. Different women have different degrees of resistance to infection and the same woman will also differ at

different times in the strength of her defense mechanisms. Stated differently, the Dalkon Shield probably weakened women's resistance to infecting agents at different rates and in different degrees, depending upon many variables, including general health, exposure to infection and many risk factors discussed in the testimony of the expert witnesses.

Ms. Whitney has proved all of her claims for relief excepting fraudulent concealment, breach of express and implied warranties and civil conspiracy.

Ms. Whitney's recovery from the hysterectomy, bilateral salpingectomy, right oophorectomy and appendectomy took over six months. She has continuing problems with her bowel and mid-cycle ovarian pain. She has been deprived of an opportunity to bear children which may adversely affect her prospects of marriage. She has an income loss of $9,000. A reasonable award for her injuries and losses is $550,000.

### MERRILYN DICKENS

This plaintiff was born December 10, 1944, and was married to Ralph Weil in her first marriage from 1964 to 1977, having three healthy children, born in 1964, 1970 and April of 1972. She had used the pill without problems but she was a smoker and upon learning that there could be blood clot problems with continuous use of the pill, she consulted with Dr. Jack Galloway in California about other methods of contraception. He suggested the Dalkon Shield because the plaintiff was only 25 years old and did not want permanent sterilization. Mrs. Dickens recalled that Dr. Galloway advised her that the Dalkon Shield was about 99% effective and because it was new, he suggested that it be removed after about 5 years. She was inserted with a Dalkon Shield on July 6, 1972.

Mrs. Dickens had regular gynecological care and pap smears. She experienced no problems except for a yeast infection in 1975 or 1976. In 1977, she consulted at the Fountain Valley Clinic in California about continuing use of the Shield because she had heard or read something about problems which women had developed when they became pregnant with an IUD. Mrs. Dickens was advised that if she was not having any difficulty she need not remove the Shield.

Mrs. Dickens was divorced in 1978. She joined the United States Army in 1979 and was stationed at Fort Carson, Colorado. She testified that she was abstinent sexually until she met Terry Dickens in March of 1980. They were married in May of 1980.

On June 26, 1980, Mrs. Dickens had a pelvic examination by a physician's assistant who reported normal results. About August 1, 1980, the plaintiff began to experience low back pain, abdominal pain, leg pains and ran a fever. She reported to the troop medical clinic on August 4, 1980 and she was referred to Dr. Cole, a gynecologist, on August 7, 1980. He had her admitted to the Fort Carson hospital for antibiotic therapy, which continued for eight days before the fever was resolved. Dr. Cole did a pelvic examination and found a left tubo-ovarian abscess. A urinalysis showed trichomonas vaginalis. Dr. Cole removed the Dalkon Shield on August 13, 1980, without difficulty, simply using a forceps and pulling on the string. He waited for the completion of antibiotic treatment to avoid flaring the infection.

Mrs. Dickens was discharged from the hospital on August 16, 1980. In the discharge summary, it was noted that Mrs. Dickens' last menstrual period was August 1, 1980. In a follow-up pelvic examination on September 5, 1980, Dr. Cole found that the mass still existed and determined that exploratory surgery was required. He had ordered a pathology examination of the removed Dalkon Shield because some tissue was adherent to it. The result was a showing of chronic inflammation, a normal finding for an IUD.

After admission to the hospital on October 6, 1980, Mrs. Dickens underwent exploratory surgery on October 7. She had been advised that her condition was serious and that a total hysterectomy might be necessary. She hoped to avoid that result because her second husband was younger and they wanted children together. Upon

opening the abdomen, Dr. Cole found conditions which made it necessary to do a total hysterectomy and lysis of adhesions. In his operative report, Dr. Cole wrote that he saw numerous serosal adhesions on the uterus, a proliferative endometrium, the right tube was a hydrosalpinx with serosal adhesions, the right ovary had serosal adhesions, and the left ovary and tube were amassed in a tubo-ovarian abscess. The cervix was considered non-diagnostic. There was sufficient blood loss during the surgery that the patient was transfused.

Mrs. Dickens was discharged from the hospital on October 14, 1980, and put on convalescent leave with a return to duty on November 12, 1980. Her postoperative course has been good and she is healthy today, except that she is, of course, a castrated woman who requires estrogen therapy. She has some depression from the fact that she cannot have children with her second husband and she is somewhat concerned about possible marital discord resulting from that disability.

The parties agree that the pathology reports show that one infecting organism was beta hemolytic streptococcus. Plaintiff's counsel contends that this normal vaginal flora was transmitted into the upper genital tract through the pathway of the tailstring.

This is a difficult case because this woman had a benign experience with the Dalkon Shield for eight years and with regular gynecological care. Her first real infection was the trichomonas vaginalis in August, 1980. The defendant's witnesses concluded that she was the victim of a virulent pathogen, either gonococcus or chlamydia, which must have come from her new sex partner, Terry Dickens. They also expressed the view that the pathway of infection was lymphatic and not through the cervix and uterus. That opinion is supported by the lack of any signs of infection in the uterus and cervix. The plaintiff's counsel counters that the reason is the antibiotic therapy and that there would be no residuals of infection in the uterus because of the sloughing of the endometrium during menstruation.

The difficulty with the defendant's approach in this case is that the plaintiff testified that both she and her husband were monogamous after they met in March, which is when they began their sexual relations. Additionally, the Eshenbach study indicates that gonococcus is a very fast acting invader and that the mean time for symptoms is one and one-half months from the date of contact with a maximum time of three months. Normally, the symptoms appear after the first menstrual period succeeding exposure. Defendant's counsel also argues that beta hemolytic streptococcus infection is a secondary invader after a gonococcus or chlamydial infection.

It is noteworthy that Dr. Cole, the treating physician, never suspected gonorrhea in this case and never ordered a culture to look for it. He is an army physician and certainly has experience in observing patients with VD. Dr. Mishell expressed the opinion that there must have been a long-term infection to produce the results observed during surgery.

The defendant's analysis of this difficult case is simplistic. After a period of abstinence, the plaintiff commenced sexual relations with a new partner and experienced a first episode of tubal and ovarian infection which became clinically evident shortly after her menses in August, 1980. From that sequence, the suggested conclusion is that she was exposed to a sexually transmitted pathogen which would have produced the same result without the presence of the IUD. Recovery in this case does not depend upon a finding that Merrilyn Dickens was not invaded by gonococcus or any other sexually transmitted pathogen. It does not require a finding that she had a long-smoldering infection of any type. What must be shown is that because she had been wearing a Dalkon Shield in her uterus for eight years, she suffered results which probably would not have occurred in the absence of that device.

Considering all of the evidence, the probabilities are that the long-term effects of the Dalkon Shield in this woman's body had

weakened her defenses and that the infection which she experienced was aggravated and enhanced by this effect, resulting in the required removal of her reproductive organs. In short, the evidence is that but for the effects of the Dalkon Shield, Mrs. Dickens would not have been castrated. The presumptions provided by the Colorado Product Liability Act have been overcome by the evidence. The ten-year presumption is also inapplicable because Robins did not adhere to the state of the art in manufacturing and marketing the Dalkon Shield because it ignored the fact that at the time, no IUD had been sufficiently tested and used to warrant the conclusion that it was as safe and effective as the defendant claimed for its experimental device.

Merrilyn Dickens has proved all of her claims for relief excepting fraudulent concealment, breach of express and implied warranties and civil conspiracy.

■ The United States Government is entitled to a separate award of $5,119. for medical care provided to Merrilyn Dickens as a member of the United States Army. For her pain, suffering and loss of further reproductive capacity, an award of $275,000 is reasonable.

## STEFANIE SELDEN

This plaintiff was born February 8, 1953 and used the pill while she was a student at St. Mary's in South Bend, Indiana. She discontinued the pill for a time when she was not sexually active. When she was studying abroad and visiting in London, England, she had a Dalkon Shield inserted in January, 1973. She discussed the Dalkon Shield with a physician and she wrote down the name so that she would be able to tell doctors in the United States what she was wearing. She remembered seeing the barbs or fins and she recalls that she had the insertion as an outpatient in a hospital with a cervical shot and that there was a lot of pain. She had some discomfort while wearing the Dalkon Shield with pain just before and during her periods. She also experienced a heavier flow.

Ms. Selden returned to South Bend and attended Notre Dame University in August, 1973. In December, 1973, and January, 1974 she began to experience sharper pains during her periods and went to Dr. Cho, a gynecologist to whom she was referred. He examined her and told her that there was a minor infection which was normal with an IUD and would go away. No medication was prescribed. The pain did go away, but returned again in about three weeks with greater intensity. On March 15, 1974, Dr. Cho removed the Dalkon Shield in the office and wrote in his notes that he suspected a twisted ovarian cyst. Dr. Cho admitted Ms. Selden to Memorial Hospital on the night of March 15, 1974 and did exploratory surgery. In the notes, which are not very extensive, Dr. Cho wrote that he found a tubo-ovarian cyst which he drained and treated with antibiotics.

Ms. Selden recovered well from the surgery, but she does have an 8″ scar about 2″ below her naval, which she finds embarrassing. She had some additional pain in January, 1975, and went back to Dr. Cho who gave her antibiotics which cleared the condition. Ms. Selden was discharged from the hospital after five days. She missed about ten days of classes, but those were made up. Her hospital expenses were about $1,000 with $250 for the surgery by Dr. Cho and $90 for anesthesia. She is now concerned about her fertility. The tests which have been performed indicate that she is fertile.

Dr. Cho told Ms. Selden that the IUD caused her infection. She, in turn, in giving her history to Dr. Rock in Rochester, New York, in the summer of 1974, told him that she had an operation associated with the Dalkon Shield which was removed in the surgery. Dr. Steinberg at the University of Colorado told Ms. Selden of the lawsuits against A.H. Robins in September, 1979, and she filed her complaint in this court on February 20, 1981.

There is a dispute as to whether Ms. Selden had a tubo-ovarian abscess. Dr. Cho did not testify in this case and Dr. Berger testified for the defense and gave an opinion that the problem was diverticu-

lum of the bowel. While the approach taken by Dr. Cho is certainly questionable in that he did exactly the reverse of other doctors by doing surgery without antibiotics and any other conservative treatment, it is difficult to deny the diagnosis which he made. Accordingly, I must conclude that there was, indeed, a tubo-ovarian abscess present in Ms. Selden in March of 1974.

In November, 1978, Ms. Selden completed an information sheet for the University of Colorado Health Service in which she wrote that her IUD caused a severe infection. At that time, she had no information in addition to what she had known in March of 1974. This claim is barred by the six year statute of limitations, C.R.S. § 13–80–110. The cause of action accrued in March, 1974. While Ms. Selden did not know of the precise defects in the product which have been revealed by the extensive evidence submitted at the trial of these consolidated cases, she knew enough to bring her suit, particularly, under the expansive product liability law in Colorado. Additionally, the evidence is not supportive of a finding of fraudulent concealment. The defendant is entitled to judgment on this claim.

## DONNA CORNELISSE

This plaintiff was born June 3, 1949, and was married to Jerry Goldsmith from July, 1967 until a divorce in October, 1972. She married John Cornelisse in July, 1979. Following the birth of a normal and healthy baby on March 24, 1968, she wore an unknown type of IUD for almost two years. She experienced spotting and cramping, as well as heavy menses during that time.

Shortly after removal of that unknown IUD, this plaintiff became pregnant and had a miscarriage following which her physician performed a dilation and curettage. She had a second normal baby on March 28, 1972 and on April 20, 1972, her physician, Dr. Farinholt, inserted a Dalkon Shield. It was her choice to use an IUD even though she felt that they were not as effective as the pill, but she is a medical technician and was concerned about health effects from the use of the pill. Barrier methods of contraception were not acceptable to her because of inconvenience.

This woman's experience with the Dalkon Shield was similar to that with the other IUD, in that she again had spotting, cramping and heavier bleeding during her periods. Because of those problems, the Dalkon Shield was removed by Dr. Farinholt on March 2, 1973. The plaintiff was divorced in October, 1973.

She decided on another Dalkon Shield and it was inserted in late 1973 or early in 1974.

In October, 1974, Mrs. Cornelisse became ill with nausea, vomiting and pain in the upper right quadrant of her abdomen, which pain also went up into her shoulder. She did not have fever. Apparently, there had been a urinary tract infection before the onset of this illness. She was admitted to Presbyterian Medical Center on October 30, 1974 and remained there until November 2. No final diagnosis of her condition was ever made. There was concern about gall bladder disease and included in the differential diagnoses were diaphramatic irritation, low grade endometritis, and Fitz-Hugh-Curtis Syndrome. PID and salpingitis were also considered as possibilities.

In November, 1978, the plaintiff suspected pregnancy and administered a pregnancy test to herself. She interpreted the results as positive and did not want to proceed with the pregnancy with the IUD in place. She called her physician, Dr. Hickman, and told him that she was spotting. She also told him that she wished to terminate the pregnancy. Dr. Hickman prescribed antibiotics and two days later, he examined her in his office and removed the Dalkon Shield. The removal was accomplished by traction on the tailstring and nothing unusual about the Shield was noted. Dr. Hickman did note a foul smelling discharge during removal. There was uterine bleeding and Dr. Hickman performed a dilation and curettage, using both suction and sharp curettage. The pathology report on the material removed showed no products of conception, and accordingly, Dr. Hickman concluded that there was a false

pregnancy, or that she may have already aborted. He noted some tenderness in the tubes.

Mrs. Cornelisse had no significant complaints during the next nine months. In August and September, she began to experience irregular menstrual periods and had a pap smear with abnormal results on September 27, 1979. Because of the abnormal pap smear, Dr. Downing did a colposcopy, on October 18, 1979, removing some cervical tissue for pathological examination. The pathologist's report was "moderate dysplasia with focal severe dysplasia" of the cervix. Because cervical dysplasia has the potential for cancer, Dr. Downing referred her to Dr. Riley for treatment. Dr. Riley recommended a hysterectomy. Mrs. Cornelisse agreed and a vaginal hysterectomy was scheduled for January, 1980. Dr. Riley also recommended a conization for further examination of cervical tissue. On December 14, 1979, Dr. Riley performed a deep cylinder cone followed by another dilation and curettage.

Mrs. Cornelisse had bleeding for the following five days at the conization site, and on December 19, 1979, she presented to the emergency room at St. Joseph's Hospital through the Kaiser Medical Facility. She was seen by Dr. Lindgren, a Kaiser staff physician, who had completed his residency about 6 months earlier. The patient presented with bleeding and Dr. Lindgren attempted to stop the bleeding with suturing at the cone site without success. He then tried to control the hemorrhaging by performing a vaginal hysterectomy. After unsuccessfully attempting the vaginal hysterectomy, the doctor opened the abdomen and removed the uterus, tubes and ovaries. In the operative report, Dr. Lindgren noted marked pelvic adhesions and marked hydrohematosalpinx, which he interpreted as chronic pelvic inflammatory disease. The pathologist's report on the removed structures diagnosed adenomyosis, a condition in which there is ingrowth of the endometrium into the muscular walls of the uterus. The pathologist also noted mild chronic salpingitis and hydrohematosalpinx and marked fibrous "perisalpingo-oophoritis."

There was no indication of disease inside the ovaries.

This is another difficult case. The defense is that there was never really any PID involved here and no association of these problems with the Dalkon Shield. It is also contended that Dr. Lindgren did not treat this patient properly in that he could have stopped the bleeding with other techniques, including ligation. At any rate, the defendant contends that it was not necessary to remove the ovaries. On that subject, I agree with the physicians who said that to leave the ovaries in alone, given the problems of infection, would be a potential for future infection, and I agree with their removal in this case.

It is difficult to say that the hospitalization in October, 1974, was due to PID. It is also difficult to say that she had PID when the Dalkon Shield was removed in November, 1978. The foul smelling discharge is a symptom of cervicitis or vaginitis and an inflammation of the lower genital tract would be the result of the Shield having been displaced into the endocervical canal. It should be noted that this, if it happened, was a displacement and not a wrong placement in the first instance.

The adhesions and other signs of chronic infection observed by Dr. Lindgren in the hysterectomy surgery could be caused by the three D & Cs which this woman had, as well as other events in her life, and may not indicate PID. There were no masses and no tubo-ovarian abscess. This woman simply did not show the same symptoms of PID which were experienced by other plaintiffs.

Upon consideration of all of the evidence, the probabilities are that Donna Cornelisse suffered from an infectious process which was not related to the Dalkon Shield and that her hysterectomy was required to repair the effects of the conization, a procedure which was also causally unrelated to the use of the defendant's product. This plaintiff has failed in meeting her burden of persuasion on the question of causation. Accordingly, judgment will enter for the defendant on this claim.

## BONNIE FRISK

She was born June 17, 1955. After she graduated from high school in June, 1973, she married her first husband, Ben Alexander, from whom she was separated in May, 1976, and divorced in December of that year. She met her present husband, Robert Frisk, in the summer of 1976, and they have a common law marriage. Mrs. Frisk began the use of the pill in late 1972, and used it until August 10, 1973, when she was inserted with a Dalkon Shield by Dr. Thumin. Dr. Thumin told her that she would have cramping and bleeding as normal effects from the Dalkon Shield which he specifically recommended. He did not warn her of any tubal infection possibilities.

During the time that she was taking the pill, Mrs. Frisk experienced nausea, some weight gain and pain with sexual intercourse.

 The insertion of the Dalkon Shield was quite traumatic and painful for this woman. She nearly fainted and was given oxygen for her recovery. The insertion was done during a menstrual period, and she did have bleeding for the next month and through the next cycle. She experienced cramping during her periods and spotting between periods and when she had a particular episode of severe cramping she went to Dr. Thumin who reassured her that everything was normal and the Dalkon Shield was in place. The plaintiff testified that in July, 1974, she went to see Dr. Thumin because she was worried from something that she had read about the FDA taking the Dalkon Shield off the market, and he again reassured her. She continued with the cramping and spotting. Finally, on February 25, 1975, she asked Dr. Thumin to remove the Shield. That was done by tugging on the tailstring and it was not painful. The removal was also during her menstrual period. She continued to have cramps and bleeding after the Shield was removed and, on April 29, 1975, went to see Dr. Thumin at his office. Dr. Thumin did a pelvic examination and in a rectal examination felt a mass posterior to the uterus. Dr. Thumin, a family physician with a general practice, then referred her to a gynecologist, Dr. Richards.

She was seen by Dr. Richards the very next day, April 30, 1975, and he also felt a mass which he estimated to be 8 to 10 centimeters and felt that it was separate from the uterus. On May 10, 1975, Dr. Richards performed an exploratory laparotomy and found a large pelvic mass in the left side which was found to be an ovary with copious amounts of purulent material, with the tube on that left side also grossly altered and enlarged. Accordingly, the left tube and ovary were removed in a left salpingo-oophorectomy. A peritoneal biopsy was also taken on the anterior surface of the uterus. The patient's condition was discussed with her husband and mother, and it was determined that because she was only 19 years old, the right tube and ovary should remain, even though she could very well have significant and serious further sickness. The pathology report on the removed tissue showed multiple abscesses in the left ovary and severe acute and chronic salpingitis in the left oviduct. Additionally, endometriosis was diagnosed. That is a condition, the cause for which is not known, in which endometrial tissue appears ectopically placed—that is, outside of the uterus, and that tissue swells and bleeds just like the endometrium in the uterine wall during menstruation.

In the discharge summary from this hospitalization, Dr. Richards wrote a diagnosis of chronic pelvic inflammatory disease with ovarian abscess, left, and endometriosis. It may be significant that there was no fever reported in the hospitalization. Mrs. Frisk was in the hospital from May 9, 1975 to May 17, 1975, and was treated with antibiotics, first intraveneously and then orally. She recovered well and, in December, 1976, she became pregnant and had an elective therapeutic abortion because she did not want children. Her husband had a vasectomy in January, 1977. Today, Mrs. Frisk lives in Montana on a farm and has been leading a normal, healthy life.

Dr. Oliphant, Dr. Berger and Dr. Keith all testified for the defendant in this case

and expressed the opinion that the diagnosis of chronic PID was wrong. They were of the view that the abscesses were caused by endometriosis. Of particular significance to these physicians was that in reporting pain with intercourse before, during and after use of the Dalkon Shield, the medical notes show particular reference to pain with deep penetration. That, they say, is a classic symptom of endometriosis. Dr. Kallmeyer also expressed the same view for the defendant, and he said that the infection was acute. They all said that endometriosis can result in adhesions and the development of a pelvic mass.

I find it difficult to disagree with the doctor and pathologist who actually did the surgery and examination of the tissue in this case. They said chronic pelvic inflammatory disease. This is a removal case and the issue of causation is dependent upon considering the probability that the trauma of removal and probable release of bacteria caused the development of infection in the oviduct. On balance, I am persuaded by the opinion of Dr. Kopelman in this case because he appeared to be the most persuasive witness.

Mrs. Frisk's causes of action for breach of warranty accrued in 1975 when she was diagnosed to have pelvic inflammatory disease with ovarian abscess and had surgery. She filed this suit May 1, 1981. Even though timely notice may have been given, her claims based on breach of warranty are barred by the four-year statute of limitation. She has proven her other claims excepting fraudulent concealment and civil conspiracy.

Mrs. Frisk had hospital bills of $1,485 and lost wages in the amount of $237. She has a surgical scar as the only lasting effect. An appropriate award of compensatory damages is $100,000.

## EXEMPLARY DAMAGES

Each of the plaintiffs asked for an award of exemplary damages in her complaint. The applicable statute is C.R.S. § 13–21–102, which provides as follows:

In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

Under the provisions of C.R.S. § 13–25–127(2) exemplary damages shall only be awarded when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in the exemplary damages statute, C.R.S. § 13–21–102.

The allowance or denial of punitive or exemplary damages rests in the discretion of the trier-of-fact. *Mince v. Butters*, 200 Colo. 501, 616 P.2d 127 (1980).

The Colorado Supreme Court affirmed a jury's award of exemplary damages for product liability in *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984). During the pre-trial proceedings in these consolidated cases, the defendant raised a number of issues in opposition to and in mitigation of any award of exemplary damages. This court deferred those issues and directed that additional evidence could be introduced if the court determined that punitive damages would be considered. The plaintiffs' evidence is complete with the exception of evidence of such matters as the financial ability of the defendant, which, of course, is a factor that can be considered in determining the amount of such damages.

In my judgment, it would be inappropriate and inequitable to award punitive damages to the plaintiffs who recover in these cases. While the Dalkon Shield has been found to be a defective product which was misrepresented with respect to its safety and efficacy, and while Robins has been found to be negligent and to have made fraudulent representations concerning safety and efficacy, those findings were made upon the basis of a preponderance of the evidence. The evidence does not support a finding that beyond a reason-

able doubt Robins caused injury to these women by circumstances of fraud, malice or insult, or a wanton and reckless disregard of their rights and feelings. Accordingly, no exemplary damages are awarded.

### AMENDED OFFER OF PROOF—DR. DOWNS

■ During the trial and after trial, the plaintiffs made an offer of proof and an amended offer of proof concerning certain testimony of Dr. Thomas Downs, a biostatistician, whose testimony was made a part of the record in certain respects. The offer concerns his analysis of data contained on computer tape which formed the basis for an article by Ronald T. Burkman, M.D. and the Women's Health Study, titled, "Association Between Intrauterine Device and Pelvic Inflammatory Disease," published in the March, 1981 issue of **Obstetrics and Gynecology.**

That article was considered by several of the expert witnesses in forming various opinions in their testimony. The article was not and should not be introduced into evidence under the limitations of the learned treatise exception to the hearsay rule in Rule 803(18) of the Federal Rules of Evidence. The thrust of Dr. Down's testimony would be that in his analysis, the computer tape data indicate that contrary to one of the conclusions in the published article, the relative risks for developing PID among long-term users is higher for the Dalkon Shield than for other devices. Also, he has the opinion that the data show that the relative risk is higher for developing PID among long-term users of Dalkon Shields as compared with non-users than indicated in the article.

The offer of proof is rejected. It is inappropriate as impeachment or contradiction of a learned treatise which is not in evidence, and it will not be considered as substantive evidence because whatever relevance it may have, its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues, and fair consideration of it would require that the defendant be given an opportunity to introduce contradictory evidence, thereby causing undue delay. For those reasons, the evidence is also rejected under Rule 403.

### DETERMINATION OF INTEREST AND COSTS

Under Colorado law, prejudgment interest must be included in the judgments on these damage awards. C.R.S. § 13–21–101. That statute is not easily applied. There is a difference between actions filed on or after July 1, 1975, and actions filed on or after July 1, 1979. Additionally, for the latter actions, interest must be computed from the date the action accrued. It is not clear what dates should be used when there is an award on multiple claims for relief based on different legal theories. The manner in which interest should be compounded is also not clear for actions filed on or after July 1, 1979. Additionally, the prevailing parties are entitled to an award of costs under 28 U.S.C. § 1920, after the filing of a bill of costs. In this consolidated trial, the allocation of costs among plaintiffs, and the manner of determining the defendant's costs in the cases where the defendant prevailed, should be considered. Because of these uncertainties, this court will defer the entry of judgment on these findings and conclusions and direct that counsel for the parties file their briefs with the court within 20 days, setting forth their respective positions with respect to the manner in which interest should be computed and costs awarded and allocated. The actual amounts of costs will be determined through the usual procedure of filing bills of costs within 10 days after the entry of judgments.

Accordingly, it is

ORDERED, that the foregoing shall constitute this court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, and it is

FURTHER ORDERED, that the parties shall file their briefs on the questions of the calculation of interest and determination and allocation of taxable costs within 20 days.